[No. A044596. First Dist., Div. One. Dec. 20, 1990.]

GEORGE CRESPIN et al., Plaintiffs and Respondents, v.
KENNETH KIZER, as Director, etc., et al., Defendants and
Appellants.

## COUNSEL

John K. Van de Kamp, Attorney General, Richard Martland, Chief Assistant Attorney General, and Charlton G. Holland III, Assistant Attorney General, for Defendants and Appellants.

Stephen Ronfeldt, Connie de la Vega, Susan Drake, Vibiana Andrade, Stanley Dorn, Jane Perkins, Lucy Quacinella, James Carroll, Melinda Bird, Stephen Schear and Carole Raimondi-Pineda for Plaintiffs and Respondents.

## OPINION

**STEIN, J.**—Respondents[1] challenged the State Department of Health Services proposed interpretation and implementation of S.B. 175 which was enacted in response to changes in federal law extending new Medicaid benefits to certain classes of aliens previously excluded from federal financial participation.

The issues raised in this appeal are whether the trial court abused its discretion by enjoining the State Department of Health Services[2] from: (1) denying Medi-Cal coverage for undocumented aliens having medical needs for long-term care or kidney dialysis, except to those aliens who were receiving these services under the Medi-Cal program as of October 1, 1988, the effective date of S.B. 175; and (2) requiring aliens applying for Medi-Cal coverage for emergency and pregnancy-related services, which is available

---

[1] Plaintiffs/respondents include Father George Crespin, the Chancellor of the Oakland Diocese, several individual aliens eligible for services under Senate Bill No. 175 (Sen. Bill No. 175, 1987-1988 Reg. Sess., was enacted on Sept. 27, 1988 [hereafter S.B. 175]), and an association of nonprofit clinics serving the indigent. For convenience, we shall hereafter refer to plaintiffs/respondents as "respondents."

[2] The named defendants/appellants were Kenneth Kizer, the Director of the State Department of Health Services, the State Department of Health Services, Elizabeth Whitney as Treasurer, Gray Davis as Controller, and Does I-XX. For convenience, defendants/appellants shall hereafter be designated as the Department.

regardless of immigration status, to disclose extensive information regarding their immigration status or that of members of their families or households.

We affirm the preliminary injunction order and remand for further proceedings.

## I. STATUTORY BACKGROUND

### A. Federal Law

The Medicaid program, established by title XIX of the Social Security Act, 42 United States Code sections 1396-1396g, is a medical assistance program jointly funded by the federal and state governments. The California program is known as Medi-Cal. (Welf. & Inst. Code, § 14000 et seq.) Under the Medicaid program, states receive federal financial participation (FFP) for services specified under federal law. The states may provide services that are not provided for under federal law, but they do so entirely at their own expense.

Section 9406 of the Omnibus Budget Reconciliation Act of 1986 (Budget Act) amended the Medicaid statute to provide that, with respect to aliens, federal financial participation was available for the full range of Medicaid services only if those services are provided to aliens with status as permanent residents under color of law (PRUCOL),[3] or to legal permanent residents. (42 U.S.C. § 1396b(v).) We shall refer to these Medicaid services as "full-scope" services or benefits.

Prior to the enactment of the Budget Act, 42 Code of Federal Regulations section 435.402(b) provided that federal financial participation was available only for medical assistance provided to "[a]liens lawfully admitted for permanent residence or permanently residing in the United States under color of law, including any alien who is lawfully present in the United States under section 203(a)(7) or section 212(d)(5) of the Immigration and Nationality Act." The Budget Act, however, created a new category of "restricted" benefits for which federal financial participation was available even if the alien recipient is not a legal resident or PRUCOL. Specifically, the Budget Act provided that federal financial participation would be available for treatment of emergency medical conditions, even for aliens not qualifying as PRUCOL or lawful residents, as long as the alien is "otherwise eligible" for Medicaid. (42 U.S.C. § 1396b(v)(2)(B).)

---

[3] Aliens are eligible for PRUCOL status if the Immigration and Naturalization Service (INS) is aware of their presence in the United States and the INS does not plan to deport them. (*Berger* v. *Heckler* (2d Cir. 1985) 771 F.2d 1556, 1560.)

In the same year, Congress also enacted the Immigration Reform and Control Act (IRCA). IRCA did not expand the scope of federal financial participation available to illegal aliens but rather disqualified from Medicaid and several other public assistance programs for five years aliens who are granted legalized status as amnesty aliens.[4] IRCA did, however, furnish federal funding for emergency and pregnancy-related services to aliens seeking amnesty, and also provided federal financial participation for full-scope Medicaid services to certain classes of amnesty aliens such as the blind and disabled. (8 U.S.C. § 1255a(b).) IRCA also authorized additional federal funding to states providing Medicaid or other benefits to amnesty aliens. (Pub.L. 99-603 § 204.) This federal funding is known as State Legalization Impact Assistance Grants, or SLIAG.

IRCA also established a new system of verifying alien eligibility for public benefits, including Medicaid. (42 U.S.C. § 1320b-7.) This system is called Systematic Alien Verification for Entitlements, or SAVE.

In sum, after these changes took effect, federal financial participation would be available for the provision of full-scope Medicaid benefits only to United States citizens and aliens who were either PRUCOL or lawfully admitted for permanent residence. With respect to aliens who were neither PRUCOL nor lawfully admitted as permanent residents, federal financial participation would be available only for restricted Medicaid benefits, i.e., treatment of an emergency medical condition. In addition, in order to receive federal financial participation, the states were to condition eligibility for full-scope benefits on status as a United States citizen or national, or verification of satisfactory immigration status. Aliens seeking only restricted benefits were exempt from the SAVE program.

*B. Senate Bill No. 175*

In response to these changes in federal law, S.B. 175 repealed former Welfare and Institutions Code section 14007.5 and enacted a new section 14007.5, which created two categories of Medi-Cal eligibility. Except in certain important respects, these new categories track those created by federal law: Full-scope Medi-Cal benefits were granted only to aliens lawfully admitted for permanent residence, or qualifying as PRUCOL. (Welf. & Inst. Code, § 14007.5, subds. (b) and (c).) All other aliens would be eligible only for restricted Medi-Cal benefits. (Welf. & Inst. Code, § 14007.5, subd. (d).)

S.B. 175 also expanded the category of restricted benefits beyond those for which federal financial participation would be available. Specifically,

---

[4] Presumably, this provision was intended to allay fears that granting amnesty would overburden these public assistance programs.

Medi-Cal covers nonemergency pregnancy-related care. (Welf. & Inst. Code, § 14007.5, subd. (d).)

In addition to these amendments to the Welfare and Institutions Code, section 1, subdivision (f), S.B. 175 specifically addressed how the state would handle coverage for aliens needing long-term care or renal dialysis.

S.B. 175 also established a state procedure for identification and verification of alien status and for the provision of benefits pending verification of alien status. (Welf. & Inst. Code, § 14007.5.)

*C. The Department's Proposed Implementation of S.B. 175*

In September of 1988, the Department, which is the state agency responsible for administering the Medi-Cal program, sent instructions on how to implement the new statute to the county welfare departments. With respect to aliens having medical needs for long-term care or renal dialysis, the Department instructed county welfare departments to verify PRUCOL status with the INS for all otherwise eligible aliens who were "receiving long-term care or dialysis benefits on October 1, 1988 [the effective date of S.B. 175]." The Department stated that these aliens would be eligible for full benefits during the verification period, and, if PRUCOL status was denied, these aliens would continue to receive limited coverage for long-term care or renal dialysis.

Under the Department's interpretation, aliens needing long-term care or renal dialysis who applied after October 1, 1988, would not receive any assistance seeking PRUCOL status and were entitled only to restricted benefits unless they could provide proof of satisfactory immigration status.

The Department also told the county welfare departments that all applicants for Medi-Cal were required to fill out a form entitled, "Statement of Citizenship, Alienage and Immigration Status," which asked whether the applicant is a citizen or alien, whether the applicant received amnesty, and, if so, the applicant's Social Security number, date of entry into the United States, and the country of the applicant's birth and citizenship. Even applicants for restricted benefits were required to fill out this form, but non-amnesty applicants for restricted benefits were not required to state, under penalty of perjury, that their answers were true. In addition, the Department's MC-210 form, which is the application form that all Medi-Cal applicants must complete under penalty of perjury, asks all applicants for restricted benefits whether they are aliens and to identify their birthplace and Social Security number, as well as the Social Security number, birthplace and immigration status of all family members.

Respondents sought and obtained a preliminary injunction against these aspects of the Department's proposed implementation of S.B. 175.

## II. Does Senate Bill 175 Restrict Coverage for Kidney Dialysis and Long-term Care to Patients Receiving Such Care on or Before October 1, 1988?

The Department requests that this court finally decide the legal issues presented in this appeal instead of merely determining the likelihood of success on the merits. Respondents, on the other hand, urge this court to limit the scope of review to whether the trial court abused its discretion in issuing the preliminary injunction.

On appeal from an order granting a preliminary injunction this court may reach the merits of any purely legal questions if the propriety of the trial court's finding regarding the "interim harm" factor is undisputed. (See, e.g., *Cohen* v. *Board of Supervisors* (1985) 40 Cal.3d 277, 288 [219 Cal.Rptr. 467, 707 P.2d 840]; *Ortiz* v. *Woods* (1982) 129 Cal.App.3d 672, 676 [181 Cal.Rptr. 209].) In these circumstances, " 'this court is in as good a position to resolve the issue now as the trial court would be after determination of this appeal.' " (*Ortiz, supra*, at p. 676.)

Respondents presented extensive, unrefuted evidence that in the absence of an injunction, they and thousands of others would risk serious disability or even death. Regarding the Department's intention to deny kidney dialysis and long-term care to patients not already receiving Medi-Cal coverage for these services as of October 1, 1988, respondents offered expert testimony showing that denying necessary long-term care would lead to the deterioration of their chronic conditions, and that they would be "increasingly subject to sudden and life-threatening medical cris[e]s such as congestive heart failure, or serious infection." The fortunate would wind-up in hospital emergency rooms, and those unable to get to an emergency room in time would die. Patients who are denied renal dialysis will develop hypertension, which can lead to strokes or cerebral bleeding and eventually death.

We will therefore proceed to a determination of the legal issue presented with respect to availability of Medi-Cal benefits for long-term care and renal dialysis even though the respondents object. (*North Coast Coalition* v. *Woods* (1980) 110 Cal.App.3d 800,4-805 [168 Cal.Rptr. 95].)[5]

The dispute over the scope of coverage S.B. 175 provided for aliens needing long-term care or renal dialysis concerns the proper construction of

---

[5] We do not, however, finally decide the merits with respect to respondents' contention that the Department must be precluded from requiring detailed disclosure of immigration status as a condition of receiving benefits, because numerous factual disputes exist.

certain uncodified provisions of S.B. 175, specifically, section 1, subdivisions (f)(1), (f)(2) and f(3).[6] The Department takes the position that section 1, subdivision (f)(3) operated solely as a "grandfather clause," providing continuation of benefits only for those aliens who were receiving long-term care or renal dialysis under the Medi-Cal program as of October 1, 1988, the effective date of S.B. 175. In the proceedings below, the Department further asserted that this same limitation applied to section 1, subdivision (f)(1). In support of this construction, the Department argued that the use of the phrase "who are receiving" in section 1, subdivision (f)(3), must refer only to aliens who were receiving Medi-Cal coverage for long-term care and renal dialysis as of October 1, 1988.

Respondents, on the other hand, contend that section 1, subdivision (f) of S.B. 175 established a two-step procedure to ensure the provision of long-term care and kidney dialysis to immigrants while simultaneously maximizing the state's receipt of federal financial participation. First, under section 1, subdivision (f)(1), the Department must take action to assure coverage of these immigrants as PRUCOL.[7] Second, under section 1, subdivision (f)(3),

---

[6] The full text of the relevant provisions of section 1 of S.B. 175 is as follows:

"(f)(1) All aliens otherwise eligible for Medi-Cal program services shall be eligible only for the scope of services their specific alien status entitles them to under federal law. In implementing this intent, the State Department of Health Services shall develop policies and procedures and take action to assure that those aliens having medical needs for long-term care services or renal dialysis services shall be considered 'permanently residing under color of law' for the purpose of determining their eligibility for Medi-Cal. The department's definition of 'permanently residing under color of law' shall conform to federal statute, and shall take into account the policy and practice of the federal Department of Health and Human Services, Health Care Financing Administration, for the purpose of obtaining federal financial participation in the Medi-Cal program and ensuring that every alien entitled to benefits under federal law shall be eligible for Medi-Cal coverage to the fullest extent to which federal financial participation is authorized by federal law.

"(2) The State Department of Health Services shall report to the Legislature on an annual basis the number of Medi-Cal beneficiaries currently receiving long-term care or renal dialysis services who are subsequently denied continuation of Medi-Cal coverage because they have not been designated as aliens permanently residing under color of law (PRUCOL) as recognized by the United States Department of Health and Human Services for the purpose of federal financial participation.

"(3) If aliens, who are receiving long-term care or renal dialysis services under the Medi-Cal program are subsequently denied full-scope Medi-Cal benefits because they have not qualified as permanently residing under color of law, they shall have the appeal rights and entitlement to continuation of benefits set forth in Chapter 7 (commencing with Section 10950) of Part 2 of Division 9 of the Welfare and Institutions Code. If, after exhausting those appeal rights, continuation of the alien's full-scope Medi-Cal coverage is not granted, the alien shall be eligible only for continuation of long-term care and renal dialysis services. Aliens shall be eligible for that continuation of long-term care or renal dialysis coverage only if otherwise eligible for Medi-Cal aside from alien status."

[7] Under federal law, while awaiting INS verification of PRUCOL, the state may not "delay, deny, reduce, or terminate" eligibility for full-scope benefits. (42 U.S.C. § 1320b-7(d)(4)(B)(ii).) Federal law further provides that the state shall not be penalized for misuse of

immigrants ultimately found not PRUCOL have full-scope benefits terminated and are eligible only for continuation of long-term care and kidney dialysis. Under respondents' construction the phrase, "aliens who are receiving," refers to aliens who are receiving long-term care and renal dialysis benefits at the time the statute is applied. This class would include aliens who are receiving Medi-Cal benefits for long-term care based on eligibility established under prior law, and those who apply at anytime who are receiving such benefits while awaiting verification of immigration status.

The dispute therefore reduces to a conflict over the meaning of the phrase "are receiving" in section 1, subdivision (f)(3) of S.B. 175.

■ As a general rule, the courts may engage in statutory construction only where the statutory language is unclear or ambiguous. (*Leffel* v. *Municipal Court* (1976) 54 Cal.App.3d 569, 572 [126 Cal.Rptr. 773].) If an ambiguity does exist, then the court may attempt to resolve the ambiguity using standard rules of statutory construction. ■ The overriding principle of statutory construction is that the court should ascertain the intent of the Legislature and construe the statute to effectuate that intent. (*Rich* v. *State Board of Optometry* (1965) 235 Cal.App.2d 591, 604 [45 Cal.Rptr. 512].) When construing a statute, the court should turn first to the language of the statute. (*California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 698 [170 Cal.Rptr. 817, 621 P.2d 856].) If necessary, the court may also turn to extrinsic aids such as legislative history and the language of other laws on the same subject. (*Mooney* v. *Pickett* (1971) 4 Cal.3d 669, 677, fn. 9 [94 Cal.Rptr. 279, 483 P.2d 1231].)

■ Viewed in isolation, the reference to aliens who "are receiving" Medi-Cal benefits for long-term care and renal dialysis is arguably ambiguous because it does not define the period that the present tense refers to. However, for reasons we shall explain, we conclude that the continuation of benefits described in section 1, subdivision (f)(3), does not apply only to aliens receiving renal dialysis and long-term care as of October 1, 1988.

Before turning to the language of the statue itself, which would normally be the starting point of our analysis, it is important to put the scope of the controversy in perspective. The Department repeatedly asserts that if section 1, subdivision (f)(3) is not construed as a grandfather clause, then S.B. 175 created an open-ended, fully state-funded program of long-term and

Medi-Cal funds paid to an immigrant whose legal status is ultimately not verified by the INS. (42 U.S.C. § 1320b-7(d)(4) and (e).) Whether the state is required to provide benefits during this "presumptive eligibility" period is being litigated by the Department in United States District Court for the Eastern Division of California in the case of *Ruiz et al.* v. *Kizer et al.*, Docket No. CIV S 88-1272 MLS.

renal dialysis care for illegal aliens. The Department implies that under respondents' interpretation of S.B. 175, the state assumed the obligation to pay, without any hope or expectation of federal financial participation, for long-term care and renal dialysis for all illegal aliens. In light of the repeated references in S.B. 175 to maximizing federal financial participation, the Department asserts that it is "absurd" to suggest that the Legislature would create such an expansive new program. ■ ■ ■ ■ Moreover, the Department asserts that if the Legislature had intended to create such a program, it would never have included the program in the uncodified portions of S.B. 175.[8]

This is a mischaracterization of the scope of the controversy. The Department concedes that many aliens having medical needs for long-term or renal dialysis care are likely to qualify for PRUCOL status under federal law because the INS may make it a practice, for humanitarian reasons, not to deport such aliens. These aliens therefore would be eligible for full-scope benefits under state and federal law. The Department further acknowledges that "in most cases renal dialysis does constitute 'emergency' treatment" for which federal financial participation is available under the Budget Act. Thus, *under either party's construction of section 1, subdivision (f)(3)*, the likely actual scope of the state's obligation is that the state would end up paying, without the benefit of federal financial participation, for continuation of benefits only for illegal aliens needing long-term care on a nonemergency basis who are denied PRUCOL status. Obviously, this is a much more limited state obligation than paying for long-term care and renal dialysis for all illegal aliens.[9]

■ There is no dispute over *whether* section 1, subdivision (f) extends Medi-Cal coverage beyond that required by federal law. The only question is *to what extent* section 1, subdivision (f) extends such coverage: Did the Legislature intend the continuation of benefits described in section 1, subdivision (f)(3) as a "grandfather clause" or as an ongoing "safety net" to insure that (1) aliens having medical needs for long-term care and renal dialysis would receive coverage while they are attempting to establish PRUCOL status, and (2) in the unlikely event that illegal aliens needing long-term care or kidney dialysis do not qualify as PRUCOL, and the kidney

---

[8] The inclusion of the provisions regarding renal dialysis and long-term care in the uncodified portion of S.B. 175 does not mean that these provisions have any less force than the codified provisions. (See, e.g., *County of Los Angeles* v. *Payne* (1937) 8 Cal.2d 563, 574 [66 P.2d 658].)

[9] Depending on the outcome of federal litigation concerning the availability of federal financial participation during the "presumptive eligibility period" while the alien is awaiting verification of PRUCOL status, state-only benefits might also be paid during the presumptive eligibility period while aliens are awaiting verification of PRUCOL status.

dialysis did not qualify as "an emergency medical condition," the alien will continue to receive benefits to cover only those specified medical needs.

Once the limited scope of this state-only funding is put in perspective, most of the Department's arguments lose their impact because they depend on the dual, faulty premises that: (1) respondents' interpretation would be inconsistent with the asserted legislative purpose of maximizing federal financial participation, and (2) the Legislature did not intend to create any new state-only benefits.

We now return to an analysis of the language of section 1, subdivision (f). Although the primary dispute centers on the correct interpretation of section 1, subdivision (f)(3), the legislative scheme for processing claims for coverage of long-term care and renal dialysis can only be understood by considering the operation of section 1, subdivisions (f)(1) and (f)(3) together.[10] As we have explained, the Department interpreted the provisions of section 1, subdivisions (f)(1) and (f)(3) to apply only to aliens who were receiving Medi-Cal coverage for renal dialysis and long-term care as of October 1, 1988. Yet the language of section 1, subdivision (f)(1) is simply not susceptible to such an interpretation. Section 1, subdivision (f)(1) provides that the Department must "develop policies and procedures and take action to assure that those aliens having medical needs for long-term care services or renal dialysis services shall be considered 'permanently residing under color of law' for the purpose of determining their eligibility for Medi-Cal." The beneficiaries of this provision are described, without qualification, as "those aliens having medical needs for long-term care services or renal dialysis services." ■ It is a basic principle of statutory construction that where the language is clear, the courts may not insert qualifying provisions not included in the plain language of the statute. (*California Teachers Assn. v. San Diego Community College Dist., supra*, 28 Cal.3d at p. 698; *Vallerga v. Dept. of Alcoholic Bev. Control* (1959) 53 Cal.2d 313, 318 [1 Cal.Rptr. 494, 347 P.2d 909].) ■ Thus, the Department erred in restricting the benefits of section 1, subdivision (f)(1) to those aliens who were receiving Medi-Cal coverage for long-term care of renal dialysis on or before October 1, 1988.

If the Legislature had also used the phrase "aliens having medical needs . . ." in section 1, subdivision (f)(3), there would be no ambiguity and we

[10] The Department represents that it does not challenge the provisions of the preliminary injunction requiring that the Department provide assistance in obtaining PRUCOL status to all aliens seeking benefits for renal dialysis and long-term care pursuant to section 1, subdivision (f)(1), regardless of whether they were receiving Medi-Cal benefits as of October 1, 1988. However, section 1, subdivision (f)(3) cannot be read in isolation, and the Department's invitation to do so artificially restricts the task of statutory construction.

would conclude that the plain language compels the application of section 1, subdivision (f)(3) to all aliens applying for Medi-Cal coverage for long-term care and renal dialysis. Instead, the Legislature used the phrase aliens "who are receiving," thereby giving rise to the ambiguity that is at the core of this litigation.

However, the ambiguity in section 1, subdivision (f)(3) may be resolved without resort to extrinsic aids, and without reading in the limitation urged by the Department, simply by reading section 1, subdivision (f)(3) together with section 1, subdivision (f)(1). If section 1, subdivision (f)(1) is understood to require the Department to give assistance in obtaining PRUCOL status to all aliens who have medical needs for long-term care and renal dialysis regardless of when they apply for such benefits, then the reference to aliens "who are receiving long-term care or renal dialysis services under the Medi-Cal program, [and] are subsequently denied full-scope Medi-Cal benefits" because they have not qualified as PRUCOL, is easily understood to include all aliens who are receiving assistance in qualifying as PRUCOL under section 1, subdivision (f)(1), and are receiving benefits pending verification of PRUCOL status.

If the Legislature had intended to limit the application of section 1, subdivision (f)(3) to aliens who were receiving services on the effective date of S.B. 175, it could have described the affected class of aliens expressly as it did elsewhere in S.B. 175. When the Legislature intended to refer only to those aliens who were receiving benefits prior to the effective date of the statute, it did so expressly by describing the class as any alien "who has been receiving Medi-Cal benefits based on eligibility established prior to the effective date of this section . . . ." (Welf. & Inst. Code, § 14007.5, subd. (f).)

Moreover, in other legislation relating to welfare benefits, when the Legislature has intended to limit the benefits to recipients eligible as of a certain date, it has done so expressly. (See, e.g., Welf. & Inst. Code, § 14005.1, subd. (c) [four months continuing Medi-Cal eligibility limited to persons losing AFDC eligibility "after October 1, 1984, and before October 1, 1988]; Welf. & Inst. Code, § 14005.13, subd. (a)(4) [therapeutic wages income exemption for Medi-Cal eligibility limited to persons receiving long-term care "commencing at least five years prior to the date of the addition of this section as originally adopted during the 1983-84 Regular Session"]; see, also, Welf. & Inst. Code, § 14463, subd. (b) [Medi-Cal prepaid health plans having contracts in existence on the "effective date of this section" receive certain announcements of risk limits]; Welf. & Inst. Code, § 14154.3, subd. (h) [counties with Medi-Cal agreements "executed prior to

the effective date of this section" protected from recoupment of federal disallowances].)

The failure of the Legislature to use the same express language limiting application of section 1, subdivision (f)(3) that it used in its amendment to Welfare and Institutions Code section 14007.5, subdivision (f), supports the inference that it did not intend such a limitation to apply to the application of section 1, subdivision (f)(3). (See, e.g, *Ruiz* v. *Industrial Acc. Com.* (1955) 45 Cal.2d 409, 413 [289 P.2d 229]; *Playboy Enterprises, Inc.* v. *Superior Court* (1984) 154 Cal.App.3d 14, 21 [201 Cal.Rptr. 207]; *People* v. *Ector* (1965) 231 Cal.App.2d 619, 625 [42 Cal.Rptr. 388].) ■ "When different language is used in the same connection in different parts of a statute it is presumed the Legislature intended a different meaning and effect." (*Charles S.* v. *Board of Education* (1971) 20 Cal.App.3d 83, 95 [97 Cal.Rptr. 422], internal quotation marks omitted.)

Furthermore, many other Medi-Cal statutes use the present tense in the same manner it was used in section 1, subdivision (f)(3), without intending to limit coverage to persons satisfying the requirements described at the time the statute was passed. For example, Welfare and Institutions Code section 14051, subdivision (c) extends Medi-Cal eligibility for "children in foster care for whom public agencies *are assuming* financial responsibility . . . ." This statute provides coverage for children meeting this require-ment at anytime, not just as of the effective date of the statute. (See, also, Welf. & Inst. Code, § 14525, subd. (c);[11] the same use of the present tense also appears in Welf. & Inst. Code, § 14017.8.)

■ Finally, we note that the legislative history of S.B. 175 also suggests that the version of section 1, subdivision (f)(3), that was ultimately ap-proved by the Legislature should not be construed merely as a "grandfather clause." Assemblyman Burt Margolin, who was the chair of the Subcom-mittee on Health and Welfare of the Committee on Ways and Means at the time S.B. 175 was passed, submitted a declaration in support of the applica-tion for a preliminary injunction. He attached a proposed amendment that was discussed in the committee and advocated by Senator Maddy. This proposed version of section 1, subdivision (f)(3) read as follows: "If aliens, *who are currently receiving long-term care or renal dialysis services under the Medi-Cal program as of the effective date of this Act* . . . ." (Italics added.) This language would have unambiguously rendered the provisions of sec-tion 1, subdivision (f)(3) merely a "grandfather clause." The committee,

---

[11] This statute covers adult day care only if "[t]he person is residing in the community." It allows coverage of such persons if they are residing in the community at the time the statute is applied, not at the time the statute was passed. (22 Cal. Code of Regs., §§ 54201 and 54209.)

however, did not include this proposed language in the final version of S.B. 175 sent to the assembly floor. ▮ ▬▮ ▮ " 'The rejection by the Legislature of a specific provision contained in an act as originally introduced is most persuasive to the conclusion that the act should not be construed to include the omitted provision.' " (*Madrid* v. *Justice Court* (1975) 52 Cal.App.3d 819, 825 [125 Cal.Rptr. 348]; accord *Western Land Office, Inc.* v. *Cervantes* (1985) 175 Cal.App.3d 724, 741 [220 Cal.Rptr. 784].)[12]

▮ The Department insists that respondents' construction of section 1, subdivision (f), would be inconsistent with the legislative purpose of S.B. 175, which the Department asserts was only to maximize federal financial participation. The Department further argues that if the state had intended to provide Medi-Cal benefits for long-term care and renal dialysis, even if federal financial participation would not be available, it would have included long-term care and renal dialysis in the definition of "restricted benefits" set forth in the new Welfare and Institutions Code section 14007.5, subdivision (d). Instead, the Department notes that the Legislature included renal dialysis and long-term care in the definition of full-scope benefits set forth in Welfare and Institutions Code section 14007.5, subdivision (b).

There is no question that one of the purposes of S.B. 175 was to permit the state to avail itself of federal financial participation. For example, section 1, subdivisions (b), (c), (d) and (e) state that because California law prohibits the payment of Medi-Cal benefits to aliens who are not found to be lawful permanent residents or PRUCOL, county hospitals and other health care providers bear the burden of providing emergency services

---

[12] Although none of Assemblyman Margolin's statements regarding his interpretation or understanding of the final version of S.B. 175 are admissible to prove legislative intent, the declaration is admissible for the purpose of establishing the objective fact that the committee discussed the proposed amendment but did not include it in the final version of the bill sent to the assembly floor. (See, e.g., *Rich* v. *State Board of Optometry, supra,* 235 Cal.App.2d at pp. 603-604.) The same restriction leads us to disregard the statements made by Senator Maddy or Clifford Allenby's opposing declarations, to the effect that they construed the final version of section 1, subdivision (f)(3) to be an even more restrictive grandfather clause than the language Senator Maddy proposed in an August 4, 1988, letter. The most that can be learned from these conflicting declarations is that a dispute did indeed exist as to whether and to what extent S.B. 175 should provide for coverage of long-term care and renal dialysis services. In committee, Senator Maddy attempted to include amendments unambiguously providing that long-term care and renal dialysis would be covered only for those receiving such coverage as of the effective date of S.B. 175 or that it would also be extended to aliens residing in California on the effective date of S.B. 175. Unable definitively to resolve the question or to reach a clear compromise, each side apparently hoped that its interpretation of the ambiguous language included in the final version of section 1, subdivision (f)(3), would be vindicated in subsequent litigation. This reality exposes the fiction this court must necessarily indulge in when it purports to ascertain a single "legislative intent," and clearly illustrates why this court must be guided instead by the language of the statute and the objective legislative history.

without state or federal reimbursement. These provisions go on to describe the changes in federal law and note that enabling legislation is necessary to "maximize the amount of federal financial participation available to the state, and to authorize Medi-Cal reimbursement." (S.B. 175 § 1, subd. (c).)

However, respondents' construction of section 1, subdivision (f), is entirely *consistent* with the goal of maximizing federal financial participation: The Department is required to assure that applicants needing long-term care or renal dialysis qualify as PRUCOL. This reading assures the receipt of full federal funding while the PRUCOL status of these applicants is being determined, and that federal financial participation will be received for those undocumented aliens needing long-term care or renal dialysis who are ultimately found PRUCOL.[13] Then, as a "safety net" the Legislature provided that, in the event that these aliens do not qualify as PRUCOL, their eligibility for full-scope benefits will be terminated and the state will fund only the provision of long-term care and renal dialysis that does not qualify for federal financial participation as an "emergency medical condition."

Moreover, the decision of the Legislature to create the special provisions in section 1, subdivision (f), for long-term care and renal dialysis allowed the state to receive federal financial participation that would not have been available if long-term care and renal dialysis had been included in the definition of restricted services in Welfare and Institutions Code section 14007.5. This is so because applicants for restricted benefits under section 14007.5, subdivision (d), are exempt from INS verification of immigration status. (Welf. & Inst. Code, § 14007.5, subd. (e).) Without INS verification, federal financial participation is available only for treatment of emergency conditions. (42 U.S.C. §§ 1320b-7(d)-(f).) Therefore, if long-term care and kidney dialysis had been included in the definition of restricted services in Welfare and Institutions Code section 14007.5, subdivision (d), as the Department argues it should have been, the state would not have received any federal financial participation for the provision of these services except to the extent they qualified as emergency services under federal law.

The Department also asserts that section 1, subdivision (f)(3) must be construed as applying only to those aliens receiving coverage for long-term care and renal dialysis as of the effective date of S.B. 175 because the Legislature clearly expressed its intent that illegal aliens would only receive the benefits for which FFP was available. The Department relies on the first sentence of section 1, subdivision (f)(1), which reads as follows: "All aliens

---

[13] Ironically, it is the Department's decision not to provide assistance in obtaining PRUCOL status for aliens applying for coverage of·long-term care and renal dialysis after October 1, 1988, that would deprive the state and counties of federal funding that would otherwise be available for these services.

otherwise eligible for Medi-Cal program services shall be eligible only for the scope of services their specific alien status entitles them to under federal law." As we have explained, however, under the interpretation advanced by either party, the result would be to extend Medi-Cal services for long-term care and renal dialysis even if federal financial participation were not provided. Moreover, the Legislature did extend the availability of Medi-Cal benefits to illegal aliens beyond those provided by federal law in the area of nonemergency pregnancy care.[14] ■ "It is . . . an established rule of statutory construction that particular provisions will prevail over general provisions."[15] (*In re James M., supra*, 9 Cal.3d at p. 522.)

The Department also argues that if the Legislature intended to provide state-only coverage of renal dialysis and long-term care, it would have clearly stated its intent to do so as it did in section 1, subdivision (g), with respect to nonemergency pregnancy care.[16] However, the explanation for the absence of a similar explicit announcement of the state's intention to shoulder the burden of paying for long-term care and renal dialysis is that the Legislature did not contemplate that the entire burden of providing these services would fall on the state's shoulders.

It is clear under the Budget Act that federal financial participation is available only for emergency labor and delivery. The state therefore had no

---

[14] S.B. 175 provides pregnancy-related services for undocumented women. (Welf. & Inst. Code, § 14007.5, subd. (d).) However, federal financial participation is available only for emergency labor and delivery. (42 U.S.C. § 1396b(v)(3).) S.B. 175 also provides Medi-Cal coverage for continuation of "medically necessary inpatient hospital services" after treatment of an emergency medical condition. (Welf. & Inst. Code, § 14007.5, subd. (d)(3).) This language does not simply track the definition of restricted services under federal law. We therefore conclude that the more specific provisions in section 1, subdivision (f)(3), constitute an exception to the general statement prefacing section 1, subdivision (f)(1). (See, e.g., *In re James M.* (1973) 9 Cal.3d 517, 522 [108 Cal.Rptr. 89, 510 P.2d 33].)

[15] The general statement in section 1, subdivision (f)(1), pertains only to the "scope" of benefits for which the alien is entitled to under federal law. Even under respondents' construction of section 1, subdivision (f)(3), an alien who does not obtain PRUCOL status is no longer eligible for full-scope benefits, and instead is entitled only to coverage for long-term care and renal dialysis.

[16] Section 1, subdivision (g) provides:

"IRCA provides Medicaid coverage to amnesty aliens for pregnancy-related services, whereas OBRA [Omnibus Budget Reconciliation Act, hereinbefore Budget Act] provides Medicaid coverage for emergency labor and delivery. To the extent these definitions may differ, *it is the state's intent to assure access to appropriate pregnancy-related care for all eligible aliens*. This care is critical to the health of expectant mothers and their unborn children. Therefore, *the State of California shall pay, through the Medi-Cal program*, for the same level of pregnancy-related services for aliens covered under OBRA as it does for those amnesty aliens under IRCA. Medi-Cal coverage shall be provided for these pregnancy-related services, *including postpartum services, as defined in Section 14005.3 of the Welfare and Institutions Code, as added by Chapter 570 of the Statutes of 1987. Furthermore, the state shall petition Congress to clearly reconcile coverage under IRCA and OBRA to assure full range of pregnancy-related services for all eligible aliens." (Italics added.)

expectation of receiving federal financial participation under *any* circumstances for the provision of nonemergency pregnancy care to illegal aliens.[17] The Legislature expressed its intent that these services would nonetheless be provided with state-only funding. Hence, the explicit announcement in section 1, subdivision (g) of S.B. 175 that the state was creating a state-only funded program to provide nonemergency pregnancy care to illegal aliens.

The Legislature also displayed special concern for the effect of the new law on the provision of long-term care and renal dialysis by specifically addressing how claims for such services should be handled in section 1, subdivision (f) of S.B. 175.[18] In contrast to aliens needing pregnancy care, aliens having medical needs for long-term care and renal dialysis were not clearly ineligible for coverage under federal law. These aliens could potentially fall through the cracks. Federal financial participation would be available to the extent that aliens needing long-term care or renal dialysis could qualify as PRUCOL, but whether they did so qualify was subject to the decision of the INS. Therefore, although there was a reasonable expectation that federal financial participation would be available for coverage of these services as full-scope benefits for aliens qualifying as PRUCOL,[19] there was no *guaranty* that these aliens would in fact be granted PRUCOL status. Thus, the apparent reason why the state did not announce, as it did in section 1, subdivision (g), with respect to nonemergency pregnancy care, that it was providing funding for renal dialysis and long-term care, despite the absence of coverage under federal law, was that aliens having medical needs for long-term care and renal dialysis could be eligible for federal benefits.

■ We conclude, based on the language of the relevant provisions of S.B 175, and the evidence of legislative intent, that the Department should be permanently enjoined from "[d]oing any of the following as to aliens seeking Medi-Cal coverage of long-term care or kidney dialysis services after October 1, 1988, and who did not receive Medi-Cal coverage of services on that date: (a) Failing to initiate verification (including secondary

---

[17] Except as explained in section 1, subdivision (g), the state did expect federal financial participation under IRCA for services provided to amnesty aliens.

[18] Even if it is difficult in the era of fiscal restraint to believe that the Legislature would be interested in extending benefits to one of the least powerful classes of potential constituents, i.e., illegal aliens, the effect of the program established by the state is arguably fiscally prudent: Respondents offered unrefuted evidence that the Department's proposed policies would cost the state money by forcing the inevitable deterioration of these medical conditions into unnecessary emergency conditions requiring extremely expensive care.

[19] According to the Department, it was also likely that even if the alien requiring renal dialysis services did not qualify as PRUCOL, the alien would qualify for restricted benefits under federal law if renal dialysis fell within the federal definition of an emergency medical condition.

verification, if necessary) with the [INS] of such persons' status as . . . [PRUCOL], or otherwise possessing satisfactory immigration status . . . ; (b) Failing to provide assistance in obtaining PRUCOL status, or other [satisfactory immigration status], that is ordinarily given to aliens receiving Medi-Cal coverage of long-term care or kidney dialysis services on or before October 1, 1988; (c) Denying full-scope Medi-Cal coverage on the basis of citizenship or immigration status while awaiting the outcome of INS verification and the completion of all applicable notice and hearing procedures; [and] (d) Denying coverage of medically necessary renal dialysis services or long-term care services for patients ultimately not found PRUCOL or otherwise possessing [satisfactory immigration status], but who are otherwise eligible for Medi-Cal."

## III. Can the Department Require Detailed Disclosure of Immigration Status to Receive Restricted Benefits?

### A. Standard of Review

 "The trial courts consider two interrelated questions in deciding whether to issue a preliminary injunction: 1) are the plaintiffs likely to suffer greater injury from a denial of the injunction than the defendants are likely to suffer from its grant; and 2) is there a reasonable probability that the plaintiffs will prevail on the merits." (*Robbins* v. *Superior Court* (1985) 38 Cal.3d 199, 206 [211 Cal.Rptr. 398, 695 P.2d 695]; see, also, *American Academy of Pediatrics* v. *Van De Kamp* (1989) 214 Cal.App.3d 831, 837 [263 Cal.Rptr. 46].) "[By] balancing the respective equities of the parties, [the court] concludes that, pending a trial on the merits, the defendant should or that he should not be restrained from exercising the right claimed by him." (*Robbins* v. *Superior Court, supra,* 38 Cal.3d at p. 206, internal quotation marks omitted.)

 This court will reverse the trial court's decision to grant or deny a preliminary injunction only if the trial court abused its discretion. (*Robbins* v. *Superior Court, supra,* 38 Cal.3d at p. 205.) Moreover, in reviewing the grant of a preliminary injunction this court " 'must "interpret the facts in the light most favorable to the prevailing party and indulge in all reasonable inferences in support of the trial court's order." ' " (*American Academy of Pediatrics* v. *Van De Kamp, supra,* 214 Cal.App.3d at p. 838.)

### B. Irreparable Harm

 Respondents presented substantial evidence that the proposed inquiries into immigration status as a condition of receiving restricted benefits would frighten many eligible aliens away from applying. They also offered

evidence that as a result of the required disclosure of immigration status many undocumented pregnant women would fail to seek necessary prenatal care, and that without such care undocumented mothers were four times more likely to give birth to a child who will die in its first year, or who will be seriously ill. Similarly, patients needing emergency care would delay as long as possible with potentially tragic results.

The Department offered no evidence other than the financial impact of the injunction to rebut respondents' showing. We therefore find that the trial court did not abuse its discretion in determining that the balance of hardships weighed in favor of granting the preliminary injunction.

## C. Likelihood of Success on the Merits

In their supplemental complaint, respondents contended that the Department planned to require applicants for restricted benefits, i.e., emergency or pregnancy-related services, to state whether they are a citizen or an alien, whether they have been granted amnesty, and whether they have been granted temporary or permanent resident status, their Social Security number, their alien registration number, the date they first entered the United States, and country of birth and citizenship. Respondents alleged that requiring disclosure of this information (1) violated the right to privacy under the California Constitution; and (2) violated sections 10000, 14000, 14000.1, 14005, 14005.4, 14005.7, subdivision (a), and 14017.8 of the Welfare and Institutions Code because the required disclosure would deter eligible aliens from applying for necessary emergency and pregnancy-related services.

Although respondents rely primarily on the argument that the required disclosure of their immigration status violates the right to privacy under the California Constitution, their claims can be resolved on purely statutory grounds without resort to an analysis of the scope of the right to privacy.

Respondents have demonstrated a substantial likelihood of success based on their contention that the scope of disclosure of immigration status enjoined by the trial court is not required either by the terms of Welfare and Institutions Code section 14007.5, subdivision (e), or by relevant provisions of federal law, and requiring the enjoined disclosures as a condition of eligibility would deter many eligible aliens from applying for Medi-Cal benefits. Thus, it is likely that the Department's policy violates the terms of Welfare and Institutions Code section 14007.5, subdivision (e), and other provisions of the code mandating that benefits be provided to all eligible persons.

Under both state and federal law, only eligibility for full-scope benefits is conditioned on proof of citizenship or legal immigration status. (Welf. &

Inst. Code, § 14007.5, subd. (b); 42 U.S.C. § 1396b(v).) Eligibility for restricted benefits is not conditioned upon proof of citizenship or legal immigration status. (Welf. & Inst. Code, § 14007.5, subd. (d); 42 U.S.C. § 1396b(v).) Therefore, the information sought by the Department is irrelevant to determining eligibility for restricted benefits.

The Department made no attempt to refute the substantial evidence offered in support of the application for a preliminary injunction to the effect that the detailed disclosure the Department sought to impose would deter many eligible illegal aliens from applying for the benefits both the state and federal government have mandated.[20] Moreover, the Legislature, in section, subdivision (i) of S.B. 175[21] specifically acknowledged that requiring detailed disclosure of alien status might deter eligible illegal aliens from applying for the restricted benefits to which they were otherwise entitled under state and federal law. Specifically, the Legislature stated that because of the substantial deterrent effect of requiring such disclosure, it was repealing former section 14007.5, which required aliens applying for Medi-Cal benefits to certify under penalty of perjury that they had one of four categories of legal status.

Nevertheless, the Department argues that the disclosure it sought to require is compelled by Welfare and Institutions Code section 14007.5, subdivision (e).[22] At most, however, the plain language of section 14007.5, subdivision (e), requires only a declaration that the applicant is either a citizen or an alien. Nothing in section 14007.5, subdivision (e), can be read

---

[20] For example, plaintiff submitted expert declarations stating the Department's proposed inquiries would "terrify" most immigrants and deter them from applying for services for which they qualify. Other declarations stated that even "lawful residents are extremely sensitive . . . because they fear . . . deportation, or that their families will be separated or uprooted." In fact, appellants concede that the proposed inquiries would be a "disincentive to apply."

[21] Section 1, subdivision (i) provides:

"Current state law requires all aliens to certify that they belong to one of four alien statuses. This certification is forwarded to the Immigration and Naturalization Service for verification. Many undocumented aliens who would qualify for Medi-Cal emergency services upon implementation of OBRA would be reluctant to apply for such services for fear that the forwarding of their statutorily mandated certification to the Immigration and Naturalization Service would result in their deportation. In order to maximize aliens' access to emergency medical care, and the federal financial participation for such care, it is necessary to repeal such law."

[22] Welfare and Institutions Code section 14007.5, subdivision (e) provides, in pertinent part: "Each county department shall require, as a condition of eligibility for Medi-Cal benefits, a declaration in writing by the individual . . . stating whether or not the individual is a citizen or national of the United States or an alien. *In order to be eligible for benefits under subdivision (b) or (c)* [i.e. full-scope benefits] an individual who declares that he or she is an alien must present alien registration documentation or other proof of satisfactory immigration status . . . ." (Italics added.)

to require the detailed disclosures enjoined by the trial court. Moreover, respondents make a persuasive argument that *none* of the provisions of section 14007.5, subdivision (e), apply to applicants for restricted services under section 14007.5, subdivision (d), because the rest of subdivision (e) discusses the verification process an alien *who applies for full-scope benefits* must go through.

The Department also argues that the enjoined disclosures are necessary in order to comply with the federal SAVE provisions set forth at 42 United States Code section 1320b-7(d)(1)(A). This section provides that "[t]he State shall require, as a condition of an individual's eligibility for benefits under any program listed in subsection (b) . . . a declaration in writing by the individual . . . under penalty of perjury, stating whether or not the individual is a citizen or national of the United States, and, if that individual is not a citizen or national of the United States, that the individual is in a satisfactory immigration status."

However, the Medicaid Catastrophic Coverage Act of 1987 added paragraph (f) to 42 United States Code section 1320b-7 which specifically exempted "aliens seeking medical assistance for the treatment of an emergency medical condition . . ." from the application of paragraph (d) and from 42 United States Code section 1320(b)-7(a)(1), which provided that the states must require applicants to disclose their social security numbers to aid in verifying whether the applicant meets the income eligibility requirements.[23]

The Department's reading of 42 United States Code section 1320b-7(f) as excluding applicants for restricted benefits only from the requirement of providing a social security number and from providing proof of satisfactory immigration status, but not from a declaration of citizenship or alienage, cannot be reconciled with the unqualified exemption from subdivision (d) stated in subdivision (f). Neither the Department's construction of Welfare and Institutions Code section 14007.5, subdivision (e), nor their interpretation of 42 United States Code section 1320b-7(f) offers any justification for requiring disclosure of the other information the trial court enjoined the Department from collecting as a condition of eligibility for Medi-Cal benefits.

---

[23] The fact that aliens applying for restricted benefits are excluded from the federal requirement that they state, under penalty of perjury, whether they are citizens or aliens, provides further support for respondents' argument that Welfare and Institutions Code section 14007.5, subdivision (e), only applies to applicants for full-scope benefits. The language of section 14007.5 regarding the declaration under penalty of perjury tracks almost exactly the language of 42 United States Code section 1320b-7(d)(1)(A). This suggests that the Legislature enacted section 14007.5 merely to implement the verification process required by federal law.

On appeal the Department offers two additional reasons why it is necessary to require the detailed disclosure regarding immigration status: (1) The disclosure is necessary to insure that *citizens* who are ineligible for benefits because they exceed the income requirements, do not apply for restricted benefits to avoid disclosing their social security numbers, and thereby conceal income that would disqualify them; and (2) the state needs to identify amnesty aliens who apply for restricted benefits in order to claim additional federal funds available through the SLIAG program.

At this stage in the proceedings there is simply no evidence in the record to support the Department's assertion that there is a significant risk that United States citizens who do not meet the Medi-Cal income eligibility will apply for restricted benefits in the hope of concealing the disqualifying income, or that the Department's proposed inquiries would avoid such fraudulent applications.[24] In any event, even if the Department had offered such evidence, this concern might justify a requirement that applicants for restricted benefits certify under penalty of perjury that they are not United States citizens. It does not, however, constitute any statutory or administrative rationale for the entire range of information the Department proposed to require.

The Department's argument that it needed to collect the information it sought in order to identify amnesty aliens who were receiving restricted benefits so that the state could claim SLIAG funds is similarly unsupported by any evidence demonstrating any relationship between the Department policy and obtaining SLIAG funds. SLIAG funds are available to states to alleviate the financial impact of providing public assistance to amnesty aliens if the state either accounts for actual expenditures or uses a statistically valid sampling of its caseload. (45 C.F.R. § 402.21(c)(1).) In supplemental letter briefs, the parties attempt to litigate before this court whether the state could obtain the information it needs to claim SLIAG funds through random sampling or some other means. Because these factual issues were not raised in the proceedings below, we shall not consider them in determining whether the trial court abused its discretion in granting the preliminary judgment.[25]

If the disclosure of immigration status is protected under the California constitutional right of privacy, then the trial court will have to determine whether the state has a compelling interest in requiring the scope of

---

[24] Applying for restricted benefits does not exempt the applicant from verification of income and resources. (22 Cal. Code Regs., § 50167, subds. (a)(7), (a)(9), (c).)

[25] We therefore deny respondents' request to take judicial notice of a brief filed by the Department in other litigation in which it asserted that statistical sampling is accurate and an acceptable method of supporting claims for federal reimbursement.

disclosure proposed by the Department and whether the state is using the least intrusive means to satisfy its interest. (See, e.g., *Loder* v. *Municipal Court* (1976) 17 Cal.3d 859, 864 [132 Cal.Rptr. 464, 553 P.2d 624]; *Wood* v. *Superior Court* (1985) 166 Cal.App.3d 1138, 1147-1148 [212 Cal.Rptr. 811].) The Department has asserted a compelling interest based on its interpretation of Welfare and Institutions Code section 14007.5, subdivision (e), and the federal SAVE program as requiring such disclosure. We have already held that respondents are likely to prevail in their contention that neither state not federal law compels the scope of disclosure that the Department proposed. The Department offered no evidence in support of its claimed interest in preventing fraud by United States citizens, and that it needed to collect all the information sought in order to obtain SLIAG funds. We therefore conclude that, at this stage in the proceedings, neither of these asserted interests undermines respondents' showing of a likelihood of success on the merits.[26]

CONCLUSION

The order granting the preliminary injunction is affirmed and the matter is remanded to the trial court for further proceedings not inconsistent with the views expressed in this opinion. Costs on appeal are awarded to respondents.

Racanelli, P. J., and Newsom, J., concurred.

A petition for a rehearing was denied January 22, 1991, and appellants' petition for review by the Supreme Court was denied March 28, 1991.

---

[26] Assuming, without deciding, that the information the Department sought is protected by the right to privacy, and that the Department's asserted interests in collecting the information regarding immigration status is "compelling," the government must use the least intrusive method of achieving its compelling interest. (*Loder* v. *Municipal Court, supra,* 17 Cal.3d at p. 864.) Resolution of this issue would require the trial court to resolve factual questions regarding, for example, the likelihood that fraud could and would be committed by United States citizens, the availability of other methods for gathering the information the Department now claims it needs to obtain SLIAG funds, and whether the scope of disclosure sought is necessary to achieving either of these goals.