Filed 5/6/26 (unmodified opn. attached)

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| TULARE MEDICAL CENTER PROPERTY OWNERS ASSOCIATION,<br><br>   Plaintiff, Cross-defendant and Appellant,<br><br>   v.<br><br>LEOPOLDO VALDIVIA et al.,<br><br>   Defendants, Cross-complainants and Respondents. | F089334<br><br>(Super. Ct. No. VCU313532)<br><br>**ORDER MODIFYING OPINION [NO CHANGE IN JUDGMENT]** |

It is hereby ordered that the opinion filed herein on April 7, 2026, be modified as follows:

1.    On page 16, the end of the first carryover paragraph, the sentence beginning "Under that test," is deleted and replaced with the following two sentences:

> That test is applied "whenever the state conditions receipt of a benefit upon the waiver of a constitutional right or discriminatorily withholds such a benefit from individuals who exercise such right." (*Id*. at p. 269.)  After analyzing the three prongs, which included weighing the utility of withholding funding against the resulting impairment to the woman's right of procreative choice, the court concluded the restrictions on funding for abortion were constitutionally invalid."

---

[*]    Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part V. of the Discussion.

2.     At the bottom of page 17, in the paragraph beginning "In addition, the Legislature," the citation to Health and Safety Code section 123462, subdivision (c) is changed to Health and Safety Code section 123420, subdivision (c).

3.     On page 18 and carrying over to page 19, the paragraph beginning "Before addressing the legal …"  is deleted and replaced with the following paragraph.

> Before addressing the legal standard for evaluating the constitutionality of the prohibition of abortion clinics, we consider (1) whether the Tulare Local Hospital District is a governmental entity; (2) the disputed issue of whether its acts in adopting and recording the CC&Rs qualify as government action for purposes of determining if sections 1 or 1.1 of article I of the California Constitution were violated; and (3) the disputed issue of whether the ban on abortion clinics in the CC&Rs constitutes an intrusion upon the fundamental right to choose to continue a pregnancy or have an abortion.

4.     In the last paragraph on page 20, the two sentences before the citation to *Anchor Pacifica* beginning "But for the actions" and "This but-for connection" are deleted and replaced with the following:

> The Tulare Local Hospital District's creation of the prohibition easily establishes a close nexus between the district's conduct and the Association's conduct of attempting to enforce the CC&Rs.

5.     On page 21, the first sentence of the first full paragraph, beginning "Consequently, we conclude" is deleted and replaced with the following:

> Consequently, we conclude as a matter of law based on the record before us that the district's acts of approving the CC&Rs and making the Property subject to the CC&Rs constitute government action for purposes of identifying the appropriate legal standard for determining whether the prohibition of abortion clinics violates the state constitution.

6.     On page 21, the following paragraph is inserted immediately before heading "D. The Compelling Interest Test Applies"

> In addition, we conclude a public entity's inclusion of a ban on abortion clinics in CC&Rs constitutes an intrusion upon the fundamental right to choose to continue a pregnancy or have an abortion.  By adopting

2.

the ban, the district used the CC&Rs to erect a barrier that, on its face, discriminatorily withholds a benefit—namely, use of the medical center—based on how the fundamental right to choose is exercised.  (See *Myers*, *supra*, 29 Cal.3d at p. 269.)  This type of discrimination by a public entity qualifies as an intrusion upon the constitutional right of privacy and right of procreative choice.

7.      On page 23, in the third full paragraph, the citation to Civil Code section 5875 is changed to Civil Code section 5975.

8.      On page 24, there are two citations to Civil Code section 5875.  The code section is changed from 5875 to 5975.

9.      On page 26, the following sentence is added to the end of the paragraph beginning "A California real property treatise …"

> We note a person asserting that a prohibition on the use of real property is void under subdivision (a) or (b) of section 53 is not required by the statutory text to prove all the elements of an Unruh Act violation.  For instance, it need not be proven that the person (or anyone else) suffered an injury or harm or that the prohibition was a substantial factor in causing that harm.  (See generally, CACI No. 3060 [essential elements of an Unruh Act claim].)

10.     On page 29, in the first full paragraph, insert footnote 6 immediately after the sentence beginning "The phrase 'is not limited to' ", which will require renumbering of all subsequent footnotes.  Footnote 6 should read as follows:

> **6**      " 'Sex' also includes, but is not limited to, a person's gender. 'Gender' means sex, and includes a person's gender identity and gender expression.  'Gender expression' means a person's gender-related appearance and behavior whether or not stereotypically associated with the person's assigned sex at birth."  (§ 51, subd. (e)(6).)  An individual's gender-related appearance and behavior are the result of the individual's personal choices (i.e., decisions).  Association's argument that it makes no sense definitionally to include an act, or the decision to undertake an act such as abortion, as a *characteristic* for purposes of the Unruh Act ignores personal decisions related to gender identity and expression are included in the definition of "sex."  Thus, Association's view that an individual's decision can never be treated as a characteristic protected by the Unruh Act contradicts the plain text of the statute.

10.     On page 38, the first paragraph beginning "One consequence of including …" is deleted and the following paragraph is inserted in its place.

One consequence of including the decision to have an abortion with the characteristics listed in subdivision (b) of section 51 is that business establishments lacking a legitimate interest (such interests are analyzed under *Harris*'s second prong) would be liable for refusing accommodations or services to individuals who were considering having an abortion or who had had an abortion, provided that the other elements of an Unruh Act violation were proven.  The parties' briefing does not discuss the existence or prevalence of this particular type of discrimination in California or elsewhere.  Examples of this type of refusal of service are (1) a taxi or ride-share driver who refuses to transport a woman from a nonprofit hospital that does not perform abortions to a hospital that performs such procedures and (2) the owner of a restaurant who refuses to serve a person seen leaving a family planning clinic because the owner perceives that person to be someone who has had or is considering an abortion.  (Cf. *Civil Rights Dept. v. Cathy's Creations, Inc.*, *supra*, 109 Cal.App.5th at p. 218 [bakery's policy of refusing to sell predesigned cake for use at same-sex wedding reception intentionally discriminated against a protected characteristic and, thus, violated the Unruh Act].)  There is nothing in the record suggesting that treating women who consider or decide to have an abortion as "a protected class under the [Unruh] Act … would open the door for a seemingly endless stream of new cases." (*Gayer*, *supra*, 231 Cal.App.3d at p. 525.)  Given the many statutes that address abortion and the private nature of the right to choose an abortion, it is unlikely the Legislature would condone discrimination against women who make a particular type of reproductive health decision.

11.     On page 39, in the first carryover paragraph in the sentence beginning "Rather, the CC&Rs" the word "individual" is changed to "individuals".

12.     On page 39, at the end of the first carryover paragraph, insert footnote 8 immediately after the sentence, "As a result, that type of compulsion is not a consequence of the statutory interpretation adopted in this opinion."

[8]     Thus, the Association's petition for rehearing greatly exaggerates the scope of this opinion by claiming it prevents an owner of an event venue from declining to rent space to someone raising funds for a pregnancy care center with a view of abortion contrary to the owner's view.  Furthermore,

4.

section 53 does not apply to this hypothetical for the additional reason that the hypothetical does not involve a recorded "written instrument relating to real property" or a recorded prohibition "by way of covenant, condition upon use or occupation, or upon transfer of title to real property." (§ 53, subds. (a), (b).)

13. In the unpublished portion of the opinion, on page 42, the first full paragraph beginning "Sixth, this opinion" is deleted in its entirety and replaced with the following paragraph:

Sixth, we do not address whether the action of state courts and judicial officers in enforcing CC&Rs that prohibit abortion clinics, whether adopted by a public or private entity, is itself sufficient to establish state action that violates the California Constitution. (See *Shelley v. Kramer* (1948) 334 U.S. 1, 14 [action by state courts enforcing restrictive covenants based on race regarded as state action for purposes of the Fourteenth Amendment].)

Appellant's petition for rehearing or in the alternative depublication filed on April 23, 2026, is denied.

FRANSON, J.

**WE CONCUR:**

HILL, P. J.

HARRELL, J.

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| TULARE MEDICAL CENTER PROPERTY OWNERS ASSOCIATION,<br><br>    Plaintiff, Cross-defendant and Appellant,<br><br>    v.<br><br>LEOPOLDO VALDIVIA et al.,<br><br>    Defendants, Cross-complainants and Respondents. | F089334<br><br>(Super. Ct. No. VCU313532)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Bret D. Hillman, Judge.

Braun Gosling, Douglas A. Gosling, Sam Van Eerden; Catherine W. Short and Corrine G. Konczal for Plaintiff, Cross-defendant and Appellant.

Herr Pedersen & Berglund, Leonard C. Herr, Rachele Berglund and Ron Statler for Defendants, Cross-complainants and Respondents.

-ooOoo-

This appeal from the denial of a preliminary injunction presents a question of state law that has not been decided by a California appellate court:  When a public entity

---

[*]    Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part V. of the Discussion.

adopts and records covenants, codes, and restrictions (CC&Rs) for a common interest development that prohibit abortion clinics within the development, is the prohibition enforceable? We conclude the prohibition is not enforceable. First, the adoption and recording of the CC&Rs is government action that, in the circumstances of this case, interferes with the fundamental right of procreative choice and, therefore, violates a fundamental public policy expressed in the California Constitution. (Cal. Const., art. I, § 1.1.) Second, Civil Code section 53[1] renders the prohibition "void" because it is a covenant or condition in a recorded instrument that "indirectly limits the … use … of [real] property because of a[] characteristic" protected by the Unruh Civil Rights Act (§ 51 et seq.; Unruh Act).

Abortion is a divisive subject, both in California and nationwide. Judicial decisions often emphasize that the *morality* of abortion is not an issue in the case. (E.g., *American Academy of Pediatrics v. Lungren* (1997) 16 Cal.4th 307, 313 (*Lungren*).) " 'The morality of abortion is not a legal or constitutional issue; it is a matter of philosophy, of ethics, and of theology. It is a subject upon which reasonable people can, and do, adhere to vastly divergent convictions and principles.' " (*Ibid.*) The California Constitution deals with the divergent views of its citizens by explicitly providing all pregnant individuals in California with a fundamental constitutional right to reproductive choice. (Cal. Const., art. I, §§ 1 [right of privacy], 1.1 [reproductive choice].) When a statutory provision intrudes or impinges upon this most intimate and fundamental constitutional right, the California Supreme Court has concluded the intrusion or impingement must be evaluated under the compelling interest standard. (*Lungren*, *supra*, at p. 340.) We conclude the compelling interest standard for state statutes also applies to the evaluation of land use restrictions in CC&Rs adopted by a public entity.

---

[1] Undesignated statutory references are to the Civil Code.

Here, the CC&Rs were adopted and recorded in 1991 by the Tulare Local Hospital District, a public entity organized under California statute. In the proceedings below, no compelling interest was demonstrated justifying the CC&Rs' prohibition of abortion clinics at the Tulare Medical Center. Consequently, enforcement of the prohibition would violate the state constitution and a fundamental public policy of California. It follows that the property owners association responsible for enforcing the CC&Rs did not show a likelihood of succeeding on the merits of its claim to enjoin a family planning clinic from providing abortion services at the medical center.

We therefore affirm the order denying the preliminary injunction.

## FACTS

In March 1991, the Tulare Local Hospital District adopted and recorded a declaration of CC&Rs for parcels of land within a common interest development known as the Tulare Medical Center. The declaration was signed by the president of the district's board of directors. In November 1991, the district's board of directors unanimously adopted resolution No. 635, which approved a declaration of annexation that added parcels in the Tulare Medical Center. The declaration of annexation was recorded in December 1991.

In 2001, the Tulare Local Hospital District executed a grant deed transferring real estate to defendants and cross-complainants Leopoldo Valdivia, M.D., and Jennifer Valdivia (collectively, the Valdivias). The grant deed described the real estate as lot 9 of tract Tulare Medical Center unit No. 2; the lot's address is on North Cherry Street (the Property). The Property is among the parcels added to the medical center by the declaration of annexation recorded in 1991. As a result, the Property is subject to the CC&Rs, which run with all lots within the development and are binding on successive owners and their tenants.

Plaintiff and cross-defendant Tulare Medical Center Property Owners Association (Association) is an unincorporated association appointed in the CC&Rs. Every owner of a parcel subject to assessment under the CC&Rs is a member of the Association. The Association is authorized by the CC&Rs to seek injunctive relief for any violation or threatened violation of its terms.

Article VII of the CC&Rs contains general area covenants addressing matters such as minimum building size, utility easements, signs, lighting, and parking. Section 7.01 of those covenants is labeled "Land Use" and provides:

> "All parcels in this phase of the development shall be used only for medically related fields and not detrimental to the TULARE LOCAL HOSPITAL DISTRICT. The decision of the declarant or thereafter the Board as whether a use is medically related or detrimental to said hospital shall be final, nor shall any unit be used for the following types of practices: *abortion clinic*, drug or alcohol care unit (including methadone clinics), emergency ward, surgi-center, chiropractory and herbal medicine. The Board shall have no authority to grant variances or exceptions from the restrictions imposed by this Section 7.01." (Italics added.)

Section 7.04 of the general area covenants in the CC&Rs is labeled "Nuisances" and provides:

> "No noxious or offensive activity shall be carried on upon the premises, nor shall anything be done thereon which may be or may become an annoyance or nuisance to the complex. All garbage shall be kept in sanitary containers and screened from view. All premises shall be maintained in an orderly fashion."

In January 2024, the Association learned the Valdivias were considering leasing the Property to defendant and cross-complainant Family Planning Associates Medical Group, Inc., a California corporation (FPA). FPA provides family planning and abortion services. On February 1, 2024, the Association's property manager sent a letter to the Valdivias quoting the abortion clinic restriction in section 7.01 of the CC&Rs and asserting FPA would not be allowed at the Property because it provides abortions.

4.

FPA's chief executive officer responded in a letter confirming FPA intended to lease the Property. The letter stated FPA provided full scope women's health and family planning services in 24 locations throughout California; its services included full scope gynecological care, STD testing and screening, sexual health education, and virtually all methods of birth control for both women and men. The letter acknowledged that FPA provides surgical abortion services at some of its locations, but "it is not one of the intended or planned uses of our occupancy" of the Valdivias' unit. In the chief executive officer's view, the absence of surgical abortion services meant the location would not be used as an "abortion clinic" as that term is used in the CC&Rs and, as a result, the intended use of the Property was not prohibited.

A March 11, 2024 letter from the Association's attorney expressed the Association's disagreement with FPA's narrow interpretation of the CC&Rs' abortion clinic prohibition and asserted it was not limited to surgical abortion but included a facility that provides any abortion services. The letter also stated the mere prospect of FPA operating at the center had caused a nuisance for other members in the form of picketers and protests, which interfered with the use and quiet enjoyment of other properties at the center. Accordingly, the letter asserted FPA's use of the Property would violate sections 7.01 and 7.04 of the CC&Rs and, thus, the Association would not allow FPA to conduct business within the center.

In September 2024, a post on FPA's public Instagram account stated it would begin seeing patients in Tulare on October 1, 2024, and gave the Property's North Cherry Street address. Abortion was the first service listed in an image that accompanied the announcement.

**PROCEEDINGS**

On September 30, 2024, the Association filed a complaint for injunctive relief against the Valdivias and FPA (collectively, defendants). After defendants answered and

5.

filed a cross-complaint,[2] the Association filed an ex parte application for a temporary restraining order and a preliminary injunction against violations of the CC&Rs.

In December 2024, defendants filed an opposition to the preliminary injunction request. Defendants argued the Association was not likely to prevail on the merits because the restriction against operation of an abortion clinic (1) discriminates against women in violation of the Unruh Act, and (2) is unconstitutional and, therefore, against California public policy. Alternatively, defendants argued that, when properly interpreted, the restriction is limited to surgical abortions because that was the only approved abortion process that existed when the CC&Rs were adopted in 1991.

The Association's reply papers addressed points raised in the opposition, including whether the CC&Rs violated the Unruh Act, the California Constitution, or public policy. The reply also argued any harm to the defendants was self-inflicted and could easily have been avoided by FPA finding another location for its clinic.

On December 16, 2024, the trial court held a hearing on the Association's request for a preliminary injunction. The court began by stating "this is a case where I think we need some appellate guidance. I think you've got a fairly clear contractual issue here, and I think you got a lot of countervailing public policy issues and identity issues on the other side of that question. [¶] I'm perfectly willing to do what the Appellate Court wants me to do on this, but at this point, I don't think it's clear enough … that I can find the [Association] is going to prevail." After hearing counsel's arguments, the court stated it would consider the matter further and issue a written ruling.

The next day, the trial court filed a ruling denying the preliminary injunction request. The court determined that, if the injunction were denied, FPA's occupancy of

---

[2] The cross-complaint's causes of action were labeled (1) declaratory relief, (2) intentional interference with contractual relations, (3) intentional interference with prospective economic relations, and (4) injunctive relief.

6.

the Property entailed a credible threat that abortion services violating the CC&Rs would be performed.  However, the court determined the Association had not met is burden of showing a likelihood of prevailing "because the court believes it is an open question, given the apparent absence of clearly relevant prior authority, whether restrictions on the operation of abortion clinics on private property, as in the subject CC&Rs, run afoul of the Unruh Civil Rights Act."

The trial court also addressed the balance of respective harms, which is the second factor a party moving for a preliminary injunction must establish.  The court concluded "the Association fails to show that the balance of harms supports the issuance of a preliminary injunction."

The trial court stated its determination of the statutory claim meant it did not need to reach the question whether the CC&Rs violated section 1.1 of article I of the California Constitution regarding reproductive freedom.  Nonetheless, the court quoted that constitutional provision and stated that it "appears, on its face, to limit solely state action and not the actions of private parties."

The Association filed a timely appeal.

In December 2025, this court issued a supplemental briefing order pursuant to Government Code section 68081 directing the parties to answer questions about whether the Tulare Local Hospital District was a public entity; whether the district's acts in adopting and recording the CC&Rs qualified as state action[3] that interfered with the rights of privacy and procreative choice contained in sections 1 and 1.1 of article I of the California Constitution; and the appropriate legal standard for determining whether any such interference was justified or invalid.

---

[3]     This opinion uses the terms "state action" and "government action" to mean the same thing.

7.

The Association's supplemental brief (1) acknowledged the Tulare Local Hospital District was a public entity in 1991 when it adopted and recorded the CC&Rs; (2) argued the district's acts of drafting, adopting, and recording the CC&Rs did not qualify as state action for purposes of the right to privacy in section 1 of article I of the California Constitution or action of "[t]he state" for purposes of section 1.1 of article I of the California Constitution; (3) asserted the applicable legal standard for testing the validity of the abortion clinic prohibition is whether the district's decision was arbitrary, capricious, or entirely lacking in evidentiary support or contrary to established public policy; and (4) argued application of that standard requires a remand to develop the factual record, after which the Association is likely to prevail on the merits. Also, the Association argued this court cannot affirm the denial of the preliminary injunction on constitutional grounds because the trial court explicitly declined to rule on those grounds and, more specifically, defendants never raised the theory that the abortion clinic prohibition was unenforceable because it was adopted by a public entity.

In comparison, defendants' supplemental brief contends (1) the Tulare Local Hospital District's acts of drafting, adopting, and recording the CC&Rs qualify as state action for purposes of constitutional analysis; (2) the compelling state interest test applies—that is, such an interest is needed to justify the interference with the right of privacy or the right to procreative choice; and (3) the Association is not likely to prevail under that test. Defendants also argued sending the case back to the trial court for a further development of the record was entirely unnecessary because the case should proceed to a final resolution of its merits rather than a reconsideration of the preliminary injunction.

## DISCUSSION

### I.  GENERAL PRINCIPLES

#### A.  Criteria for Granting a Preliminary Injunction

Code of Civil Procedure section 526 authorizes trial courts to issue injunctions during the litigation.  (*County of Kern v. T.C.E.F., Inc*. (2016) 246 Cal.App.4th 301, 315 (*T.C.E.F.*).)  The decision whether to issue a preliminary injunction requires the court to weigh two interrelated factors: (1) the likelihood the moving party will prevail on the merits at trial and (2) the relative balance of interim harms that are likely to result from granting or denying a preliminary injunction.  Generally, the weighing of the factors lies within the trial court's discretion.  (*Ibid*.)

#### B.  Standards of Review

The parties disagree on the applicable standard of review.  Defendants contend the Association's appeal challenges the trial court's determination that the facts and circumstances presented did not demonstrate a likelihood that the Association would prevail.  Based on this interpretation of the court's decision, they conclude it should be reviewed for an abuse of discretion.  In contrast, the Association's initial briefing contends the trial court's assessment of the likelihood of success on the merits depended upon legal rather than factual questions and, therefore, the standard of review is de novo.

This court's decisions acknowledge the general principle that rulings on an application for a preliminary injunction are reviewed for an abuse of discretion. (*T.C.E.F.*, *supra*, 246 Cal.App.4th at pp. 315–316; see *Tulare Lake Canal Co. v. Stratford Public Utility Dist.* (2023) 92 Cal.App.5th 380, 402 (*Tulare Lake*).)  We also stated that description of the standard of review was incomplete "because the abuse of discretion standard is not unified and a more specific rule might apply once the appellate court has identified the particular aspect of the trial court's determination being challenged."

9.

(*T.C.E.F.*, *supra*, at p. 316, citing *Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711; see *Tulare Lake*, *supra*, at p. 402.)

When the challenged aspect is the sufficiency of the evidence to support the trial court's express and implied findings of fact, the substantial evidence standard applies. (*T.C.E.F.*, *supra*, 246 Cal.App.4th at p. 316.) When the challenged aspect is the trial court's resolution of a question of law, an independent (i.e., de novo) review is conducted on appeal. (*Ibid.*) In particular, when the likelihood of prevailing on the merits depends on a question of law, an appellate court independently decides that question of law and, thus, whether there was a possibility of the moving party succeeding on the merits. (*Id.* at p. 317.) In accordance with the general principle that an appellant has the burden of affirmatively demonstrating prejudicial error, a party challenging the grant or denial of a preliminary injunction has the burden of showing trial court error under the foregoing standards of review. (*Tulare Lake*, *supra*, 92 Cal.App.5th at pp. 403, 415; see *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [appellant's burden to demonstrate error].)

C.     Presumption that CC&Rs Are Valid and Enforceable

Both the Commercial and Industrial Common Interest Development Act (§§ 6500–6876) and the Davis-Stirling Common Interest Development Act (§§ 4000–6150) address the enforceability of covenants and restrictions in a declaration for a common interest development. Sections 5975 and 6856 contain identical subdivisions (a), which state: "The covenants and restrictions in the declaration shall be enforceable equitable servitudes, unless unreasonable, and shall inure to the benefit of and bind all owners of separate interests in the development. Unless the declaration states otherwise, these servitudes may be enforced by any owner of a separate interest or by the association, or by both."

The Supreme Court interpreted the text of these subdivisions' first sentence when that text was contained in former section 1354, subdivision (a). (*Nahrstedt v. Lakeside*

10.

*Village Condominium Assn.* (1994) 8 Cal.4th 361, 378 (*Nahrstedt*).)  The court first concluded the use of the phrase "unless unreasonable" cloaked use restrictions in recorded CC&Rs "with a presumption of reasonableness by shifting the burden of proving otherwise to the party challenging the use restriction." (*Id*. at p. 380.)[4]

Next, because the Legislature used the term "enforceable equitable servitudes," the court stated it "must examine the principles governing enforcement of equitable servitudes." (*Nahrstedt*, *supra*, 8 Cal.4th at p. 380.)  The court distilled the following principle from its review of case law and other authorities:  "An equitable servitude will be enforced unless [1] it violates public policy; [2] it bears no rational relationship to the protection, preservation, operation or purpose of the affected land; or [3] it otherwise imposes burdens on the affected land that are so disproportionate to the restriction's beneficial effects that the restriction should not be enforced." (*Id*. at p. 382.)  The court determined these standards were embedded in the statutory text and, therefore, concluded use restrictions for a common interest development "should be enforced unless they are wholly arbitrary, violate a fundamental public policy, or impose a burden on the use of affected land that far outweighs any benefit." (*Ibid*.)

The court explained its interpretation by stating:  "Our social fabric is founded on the stability of expectation and obligation that arises from the consistent enforcement of the terms of deeds, contracts, wills, statutes, and other writings.  To allow one person to

---

**4**     The parties' appellate briefing does not explicitly address which act applies to the CC&Rs.  The Association's opening brief refers to former section 1354 and the defendants' respondents' brief quotes section 5975.  Because the relevant text is the same in each act, we need not resolve which one applies in this case. (See § 4202.)  We note that papers filed by the Association with the trial court state its action was brought under section 6856, which suggests the Tulare Medical Center is exclusively commercial or industrial development with no residential component.  (See 8 Miller & Starr, Cal. Real Estate (2025 4th ed.) § 28:1, p. 714 [developments with mixed residential and commercial components are governed by the Davis-Stirling Act].)

escape obligations under a written instrument upsets the expectations of all the other parties governed by that instrument ... that [it] will be uniformly and predictably enforced." (*Nahrstedt, supra*, 8 Cal.4th at p. 384.) The court rejected a case-by-case inquiry into the reasonableness of a use restriction because such inquiries would impose substantial litigation costs and strain the social fabric of the development. (*Ibid.*) As a result, the reasonableness of a use restriction is "determined *not* by reference to facts that are specific to the objecting homeowner, but by reference to the common interest development as a whole." (*Id*. at p. 386.)

In *Nahrstedt*, the Supreme Court applied the foregoing principles to conclude as a matter of law that the challenged pet restriction prohibiting dogs and cats was rational and enforceable. (*Nahrstedt, supra*, 8 Cal.4th at p. 386.) As a result, the court determined the plaintiff homeowner failed to state a cause of action for declaratory relief holding the pet restriction unenforceable. (*Id*. at p. 388.)

To summarize, we conclude the statutory interpretation set forth in *Nahrstedt* governs in this case, regardless of whether the CC&Rs are subject to section 5975 or section 6856. Under that statutory interpretation, defendants have the burden of rebutting the presumption that use restrictions are reasonable and, to carry that burden, they must show the prohibition of abortion clinics is "wholly arbitrary, violate[s] a fundamental public policy, or impose[s] a burden on the use of affected land that far outweighs any benefit." (*Nahrstedt, supra*, 8 Cal.4th at p. 382; 8 Miller & Starr, Cal. Real Estate, *supra*, §§ 28:108, 28:221, pp. 988, 1193 [enforcement of restriction in CC&Rs].)

II.     CALIFORNIA'S PUBLIC POLICIES RELATING TO ABORTION

A.     Identifying Fundamental Public Policies

The inquiry into whether a land use restriction, such as the prohibition of abortion clinics, violates a fundamental public policy raises a question of law about how courts identify a public policy that is fundamental. This question is addressed (1) in

12.

employment law cases discussing the tort of wrongful discharge of an at-will employee in violation of public policy and (2) in cases involving attorney fees awards under the private attorney general doctrine, which is codified in Code of Civil Procedure section 1021.5.

In *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, the Supreme Court determined that "when an employer's discharge of an employee violates *fundamental* principles of public policy, the discharged employee may maintain a tort action and recover damages traditionally available in such actions." (*Id*. at p. 170, italics added.) Later, the court concluded "employees who assert *Tameny* claims must show that the important public interests they seek to protect are 'tethered to fundamental policies that are delineated in constitutional or statutory provisions.' (*Gantt v. Sentry Insurance* (1992) 1 Cal.4th 1083, 1095." (*Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 71; see *Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1252, 1256 [a policy embodied in a constitutional provision is a fundamental public policy for purpose of a wrongful discharge claim].) In *Green*, the court expanded this principle, concluding administrative regulations implementing a public safety statute are "a source of fundamental public policy that limits an employer's right to discharge an at-will employee." (*Green*, *supra*, at p. 71 [federal regulation promulgated under the Federal Aviation Act of 1958].) The court stated it "continue[d] to believe that, aside from constitutional policy, the Legislature, and not the courts, is vested with the responsibility to declare the public policy of the state." (*Ibid*.)

Similarly, in cases applying the private attorney general doctrine, our Supreme Court has stated that " 'doctrine rests upon the recognition that privately initiated lawsuits are often essential to the effectuation of the fundamental public policies embodied in constitutional or statutory provisions.' " (*Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1218, quoting *Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23

13.

Cal.3d 917, 933; see Code Civ. Proc., § 1021.5.) These cases confirm constitutional and statutory provisions as sources of California's fundamental public policies.

We conclude the method for identifying fundamental public policies adopted in the foregoing cases applies in the context of determining whether a land use restriction contained in the CC&Rs of a common interest development violates a fundamental public policy and, thus, is "unreasonable" for purposes of subdivision (a) of either section 5975 or 6856. (See *Nahrstedt*, *supra*, 8 Cal.4th at p. 382 [interpreting predecessor statute].) The parties have not suggested a different method should be used.

B.     Policies of Reproductive Freedom and Privacy

1.     *Historical Overview of the State Constitutional Right*

In *People v. Belous* (1969) 71 Cal.2d 954, the California Supreme Court recognized a "fundamental right … to choose whether to bear children" was included in the implied state constitutional right to privacy or in the liberty afforded matters related to marriage, family, and sex. (*Id.* at p. 963.)

In 1972, California's voters added an explicit right of privacy to the other inalienable rights protected by the state constitution. (*White v. Davis* (1975) 13 Cal.3d 757, 773.) As a result, section 1 of article I of the California Constitution states: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and *privacy*." (Italics added.)

In 1973, four years after the California Supreme Court recognized the state constitutional right of procreative choice in *People v. Belous*, *supra*, 71 Cal.2d 954, the United States Supreme Court decided *Roe v. Wade* (1973) 410 U.S. 113 and acknowledged the existence of a comparable right under the Fourteenth Amendment.

In June 2022, United States Supreme Court decided *Dobbs v. Jackson Women's Health Organization* (2022) 597 U.S. 215 (*Dobbs*), concluding the United States

14.

"Constitution does not prohibit the citizens of each State from regulating or prohibiting abortion." (*Dobbs*, *supra*, at p. 302.) Accordingly, the court overruled *Roe v. Wade*, *supra*, 410 U.S. 113, and "return[ed] that authority to the people and their elected representatives." (*Dobbs*, *supra*, at p. 302.) As a result, the right to procreative choice discussed in this opinion is derived entirely from California law and the federal constitution plays no role in defining that right.

In November 2022, California's electorate exercised the authority to regulate abortion identified in *Dobbs* and approved Proposition 1. It added section 1.1 of article I of the California Constitution, which provides in full:

> "The state shall not deny or interfere with an individual's reproductive freedom in their most intimate decisions, which includes their fundamental right to choose to have an abortion and their fundamental right to choose or refuse contraceptives. This section is intended to further the constitutional right to privacy guaranteed by Section 1, and the constitutional right to not be denied equal protection guaranteed by Section 7. Nothing herein narrows or limits the right to privacy or equal protection."

As a result, the fundamental right to choose that had been regarded as part of the constitutional right to privacy was made explicit. Based on the foregoing history and the wording of section 1.1 of article I of the California Constitution, we conclude the case law addressing the right to privacy is relevant to interpreting the reproductive freedom afforded individuals by section 1.1 of article I. That constitutional provision was relied upon by defendants in the trial court in arguing the prohibition of abortion clinics was unconstitutional and, thus, was against California public policy.

### 2. Case Law

Several decisions of the California Supreme Court have addressed the right to choose to bear a child or have an abortion embedded in the right to privacy. In 1981, nine years after the explicit right to privacy was added to the California Constitution, the court determined restrictions in a state budget act that eliminated Medi-Cal funding of

abortions while maintaining Medi-Cal funding of prenatal care and childbirth was unconstitutional because it violated a pregnant woman's right to privacy. (*Committee to Defend Reproductive Rights v. Myers* (1981) 29 Cal.3d 252 (*Myers*).) The court described "the decision whether to bear a child or to have an abortion [as] so private and so intimate that each woman in this state[—]rich or poor[—]is guaranteed the constitutional right to make that decision *as an individual*, uncoerced by governmental intrusion." (*Id.* at p. 284.) The court evaluated the constitutionality of the legislation by applying a "three-part test" it referred to as the "*Danskin-Bagley* doctrine." (*Id*. at pp. 257–258, 268.) Under that test, the court concluded the restrictions on funding for abortion were constitutionally invalid. (*Id*. at p. 285.) The court also stated, "we believe that the statutes in question are additionally unconstitutional under established equal protection principles." (*Id*. at p. 277, fn. 22.)

In 1997, the Supreme Court addressed the validity of a statute requiring a pregnant minor to secure parental consent or judicial authorization before obtaining an abortion. (*Lungren*, *supra*, 16 Cal.4th at p. 313.) The court concluded the state constitution provided greater protection of a woman's right of choice than the federal constitution and the privacy protections in the state constitution encompassed procreative decisionmaking. (*Id*. at p. 327.) As a result, the court evaluated the statute's validity under state constitutional principles rather than federal law. (*Id*. at p. 328.) It concluded a pregnant woman's right of choice was clearly among the most fundamental of all state constitutional rights and a statutory intrusion on this fundamental right must be evaluated under the compelling interest standard. (*Id*. at pp. 333, 340.) After concluding the defendants had failed to demonstrate a compelling interest justified the intrusion on a pregnant minor's state constitutional right to privacy, the court affirmed a judgment permanently enjoining the statute's enforcement. (*Id*. at pp. 324, 359.)

### 3. *Public Policy Embodied in Statute*

Our discussion of California's public policies relating to abortion also considers the public policies declared by the Legislature. In the Reproductive Privacy Act of 2002 (Health & Saf. Code, § 123460 et seq.), the Legislature declared "that every individual possesses a fundamental right of privacy with respect to personal reproductive decisions, which entails the right to make and effectuate decisions about all matters relating to pregnancy, including … abortion care." (Health & Saf. Code, § 123462.) In accordance with this recognition of individual rights, "it is the *public policy* of the State of California that ... [e]very pregnant individual … has the *fundamental right* to choose to bear a child or to choose to have and to obtain an abortion ...." (Health & Saf. Code, § 123462, subd. (b), italics added.)

Tensions can arise between a pregnant individual's right of self-determination and the autonomy interests of healthcare providers. The Legislature has protected provider autonomy by recognizing the right of certain persons to refuse to directly participate in performing an abortion. Health and Safety Code section 123420, subdivision (a) provides:

> "No employer or other person shall require a physician, a registered nurse, a licensed vocational nurse, or any other person employed or with staff privileges at a hospital, facility, or clinic to directly participate in the induction or performance of an abortion, if the employee or other person has filed a written statement with the employer or the hospital, facility, or clinic indicating a moral, ethical, or religious basis for refusal to participate in the abortion."

In addition, the Legislature has provided that a nonprofit hospital or other facility or clinic organized or operated by a religious entity is not required to permit or provide abortion services. (Health & Saf. Code, § 123462, subd. (c); see generally, Miller, *Reflections on Protecting Conscience for Health Care Providers: A Call for More Inclusive Statutory Protection in Light of Constitutional Considerations* (2006) 15 S. Cal. Rev. L. & Soc. Just. 327, 331.) The Legislature has not extended the freedom of choice

afforded individual doctors, nurses and other employees to public entities such as local healthcare districts or to nonpublic entities generally.  Accordingly, Association's references to Health and Safety Code section 123420 do not demonstrate California has a public policy that allows a local hospital district to interfere with individuals' autonomy and freedom of choice.

The Legislature has adopted several other statutes addressing abortion, including the Abortion Accessibility Act (Health & Saf. Code, § 1367.251; Ins. Code, § 10123.1961; see Stats. 2022, ch. 11, §§ 1. 2.)  Many of the statues address economic and financial issues that impact access to abortion and contraception.  (See Health & Saf. Code, §§ 140 [California Reproductive Justice and Freedom Fund], 123430, subd. (a)(1) [Health and Human Services Agency internet website giving the public access to information about abortion services in the state], 123451–123453 [Abortion Practical Support Fund], 127630–127639 [Reproductive Health Equity Fund]; Ed. Code, § 99251, subd. (a) ["each public university student health center shall offer abortion by medication techniques onsite"]; Lab. Code, § 2808.1 [Department of Industrial Relations website about abortion and contraception benefits or services]; Bus. & Prof. Code, § 8790 [expedited the licensure process for an applicant who intends to provide abortions].)

### 4.    Conclusion

The foregoing authorities establish a fundamental public policy of California is (1) to protect an individual's personal choice on the subject of abortion, which includes a pregnant person's right to choose to continue a pregnancy or have an abortion (see Cal. Const., art. I, § 1.1), and (2) to limit government action that unduly intrudes or impinges that choice.

## III.    UNCONSTITUTIONAL GOVERNMENT ACTION

Before addressing the legal standard for evaluating the constitutionality of the prohibition of abortion clinics, we consider (1) whether the Tulare Local Hospital District

18.

is a governmental entity and (2) the disputed issue of whether its acts in adopting and recording the CC&Rs qualify as government action for purposes of determining if sections 1 or 1.1 of article I of the California Constitution were violated.

### A. Local Hospital Districts are Public Entities

The Association's supplemental brief concedes the Tulare Local Hospital District was a public (i.e., government) entity in 1991 when it recorded the CC&Rs. We accept this concession. (See Health & Saf. Code, § 32000 et seq.; Stats. 1945, ch. 932, § 1 ["The Local Hospital District Law"]; Stats. 1994, ch. 696, § 1 [renamed "The Local Health Care District Law"]; *Rosner v. Eden Township Hospital Dist.* (1962) 58 Cal.2d 592, 594 [Eden Township Hospital District referred to as "a governmental entity functioning under The Local Hospital District Law"].)

### B. Role of Government Action in the Legal Analysis

The Association's supplemental brief states the constitutional right to privacy "does not have a state action requirement, so the concept of 'qualifying as state action' does not apply," but "the distinction between government and private action is nonetheless relevant to determining whether [there was] an actionable invasion[.]" We agree that either government or private action is capable of unlawfully infringing the right of privacy. (See *Lungren*, *supra*, 16 Cal.4th at p. 329; *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 20 [Cal. Const., art. I, § 1 "creates a right of action against private as well as government entities"]; *Conservatorship of Wendland* (2001) 26 Cal.4th 519, 541, fn. 10.) We also agree the existence of government action controls the legal standard for evaluating whether a constitutional violation occurred.

A question of state constitutional law not resolved in an appellate decision is whether the right to procreative choice, like the right to privacy, is protected from infringement by private entities. We note this question but do not resolve it because, as explained below, the existence of government action and the lack of a compelling interest

19.

establish a constitutional violation that justifies the denial of the preliminary injunction request.  (See fn. 5., *post*.)

C.   Existence of Government Action in this Case

The Association's supplemental brief contends the Tulare Local Hospital District's act of drafting, adopting, and recording the CC&Rs do not qualify as state action.  This contention implies the relevant conduct is limited to the enforcement of the abortion clinic prohibition and excludes the creation of the prohibition.  The Association asserts the district is in no way involved in enforcing the CC&Rs and, moreover, defendants did not argue in the trial court that government action was at issue.  We conclude that whether government action is implicated in this litigation is a question of law that can be properly raised and resolved at the appellate level.  (See *Esparza v. KS Industries, L.P.* (2017) 13 Cal.App.5th 1228, 1237–1238 [appellate courts have discretion to address legal questions not raised in the trial court when the question can be decided based on uncontroverted facts in the record]; *Crespin v. Kizer* (1990) 226 Cal.App.3d 498, 507 [when reviewing a preliminary injunction, appellate court may reach the merits of purely legal questions].)

A question of law is presented because the undisputed evidence shows (1) the initial recording of the CC&Rs was done by the Tulare Local Hospital District's president and (2) the Property became subject to the abortion clinic prohibition in the CC&Rs as a result of the district's voter-elected board of directors unanimously approving the declaration of annexation and the subsequent recording of that declaration.  But for the actions of the Tulare Local Hospital District, the prohibition would not exist.  In other words, there would be no prohibition for the Association to enforce pursuant to the authority granted to it by section 6.01 of the CC&Rs.  This but-for connection between the district's conduct in creating the CC&Rs and the Association's conduct in attempting to enforce the CC&Rs establishes a close nexus between the district's conduct

and the Association's conduct. (See *Anchor Pacifica Management Co. v. Green* (2012) 205 Cal.App.4th 232, 243 [state action exists where there is such a close nexus between the state and the challenged action that seemingly private behavior may be fairly treated as action of the state itself], citing *Brentwood Academy v. Tennessee Secondary School Athletic Assn.* (2001) 531 U.S. 288, 295.) The foundational role of the district's conduct means the Association's lawsuit is more than *entwined* with the district's abortion policy. The lawsuit is an attempt to implement that policy even though the district itself is not a party to the litigation. (See *Anchor Pacifica Management Co.*, *supra*, at p. 243.)

Consequently, we conclude as a matter of law that the district's acts of approving the CC&Rs and making the Property subject to the CC&Rs constitute government action for purposes of identifying the appropriate legal standard for determining whether the prohibition of abortion clinics violates the state constitution.[5]

D.      The Compelling Interest Test Applies

The legal standard for determining whether government action intruding on a privacy interest violates the state constitution varies depending upon the privacy interest asserted. (*Lewis v. Superior Court* (2017) 3 Cal.5th 561, 572.) In *Lewis*, the court stated it had "limited the application of the 'compelling interest test' to those cases that implicate an 'obvious invasion of an interest fundamental to personal autonomy.' " (*Ibid.*) The court described cases in which it applied a general balancing test without

_____

[5]      Based on this conclusion, we do not reach the question whether the Association and its conduct in enforcing the prohibition constitutes the actions of a quasi-public or quasi-governmental entity for purposes of state constitutional analysis. (See *Valley Hospital Assn., Inc. v. Mat-Su Coalition for Choice* (Alaska 1997) 948 P.2d 963 [nonprofit corporation operating a hospital was a quasi-public institution; its policy on abortion did not comply with the state constitutional right to privacy; permanent injunction against enforcing the policy affirmed].) Also, we do not address the legal standard used to determine when private action is unlawful because it interferes with the constitutionally protected rights of privacy and reproductive freedom.

21.

requiring the asserted countervailing interest to be compelling. (*Id*. at p. 573.) Next, the court stated:

> "The only case requiring a compelling interest involved a challenge to a statute requiring a pregnant minor to obtain parental consent or judicial authorization before having an abortion, an issue that 'unquestionably impinges upon "an interest fundamental to personal autonomy." ' (*American Academy of Pediatrics v. Lungren*[, *supra,*] 16 Cal.4th 307, 340.)" (*Lewis*, *supra*, 3 Cal.5th at p. 573.)

Consequently, we conclude the compelling interest test applies to the CC&Rs' prohibition of abortion clinics. To the extent the Association contends the compelling interest test should be limited to statutes enacted by the Legislature, like statutes in questions in *Myers* and *Lungren*, we reject that contention.

Here, the Association's papers requesting a preliminary injunction incorrectly treated the land use restriction as solely a private contractual matter and made no attempt to identify a compelling interest that justified the Tulare Local Hospital District's impingement of an interest fundamental to personal autonomy. As a result of this omission, the Association's papers did not demonstrate any likelihood of succeeding in having the prohibition of abortion clinics upheld under the compelling interest test. Indeed, the trial court stated, "the Association d[id] not submit any argument, or evidence, to the effect that a legitimate business interest underlies the CC&Rs prohibition of abortion clinics." Consequently, no purpose would be served by remanding the matter to the trial court for further consideration of the Association's evidence to determine whether that evidence carried the Association's burden, as moving party, of demonstrating a compelling interest giving it a likelihood of succeeding on the merits. Furthermore, the proper course is not to give the Association a second bite at the preliminary injunction apple, which would delay the ultimate resolution of this case. Rather, the Association will have an opportunity in subsequent proceedings (e.g., a

22.

motion for summary judgment or trial) to develop the evidence it considers relevant to evaluating the prohibition under the compelling interest test.

E.     Standing to Raise the Public Policy Defense

The Association has argued that defendants lack standing to raise the Unruh Act as a defense to the enforcement of the CC&Rs.  Here, we consider whether defendants have standing to defend against the enforcement of the CC&Rs on the ground that the prohibition of abortion clinics violates a fundamental public policy.

A person's standing to raise a defense is not addressed in the Code of Civil Procedure.  In contrast, standing to sue is.  "Every action must be prosecuted in the name of the real party in interest, except as otherwise provided by statute."  (Code Civ. Proc., § 367.)  Thus, a person who commences a judicial proceeding is required to " 'have a real interest in the ultimate adjudication.' "  (*Schmier v. Supreme Court* (2000) 78 Cal.App.4th 703, 707.)  Such an interest is lacking if the party has " 'neither suffered nor is about to suffer any injury of sufficient magnitude reasonably to assure that all of the relevant facts and issues will be adequately presented.' "  (*Ibid*.)  The purpose of the statutory requirement that claims be prosecuted by the real party in interest (i.e., a party with standing) "is to prevent a defendant against whom a judgment may be obtained from further harassment or vexation at the hands of other claimants to the same demand." (*Giselman v. Starr* (1895) 106 Cal. 651, 657.)

The statute invoked by the parties provides that a CC&Rs land use restrictions are enforceable "unless unreasonable."  (§§ 5875, subd. (a), 6856, subd. (a).)  We interpret the statutory text to mean that owners of a unit in a common interest development and their tenants are allowed to defend against a suit alleging they are violating a restriction in the CC&Rs by arguing the restriction is "unreasonable"—that is, it (1) is wholly arbitrary, (2) violates a fundamental public policy, or (3) imposes a burden on the use of affected land that far outweighs any benefit.  (*Nahrstedt, supra*, 8 Cal.4th at p. 380.)

23.

More specifically, we conclude such defendants have standing to argue a restriction violates a fundamental public policy because it interferes with the constitutional rights of third parties who might patronize the business being operated on the property. A simple analogy demonstrates this point. If a restriction prohibits a business in a common interest development from serving members of a particular race or ethnicity, the owner of the business should be allowed to defend against enforcement even if the owner is not a member of that race or ethnicity. In that situation, as here, the owner of the business has sufficient interest at stake to assure the relevant facts and issues are adequately developed. (See *Schmier v. Supreme Court*, *supra*, 78 Cal.App.4th at p. 707.) Consequently, defendants have standing to raise section 1.1 of article I of the California Constitution as a basis for concluding the CC&Rs' prohibition of abortion clinics is "unreasonable." (§§ 5875, subd. (a), 6856, subd. (a).)

F.    Summary

The presumption that restrictions in CC&Rs are valid has been rebutted at this stage of the proceedings. The undisputed facts in the record show that (1) the abortion clinic prohibition was adopted by a government entity and, thus, the enforcement of that prohibition by the Association implicates government action and (2) the prohibition interferes with the right of privacy and the right of reproductive choice explicitly protected by the California Constitution. As a result, the burden shifted to the Association to demonstrate that the governmental interference was justified by a compelling state interest, which the Association failed to do. The unjustified governmental interference with constitutionally protected rights violates a fundamental public policy of the State of California, which renders the CC&Rs' prohibition of abortion clinics "unreasonable" and, thus, unenforceable. (§§ 5875, subd. (a), 6856, subd. (a).) These conclusions demonstrate the Association did not establish it was likely

24.

to succeed on the merits and, thus, provide one ground for affirming the denial of the Association's request for a preliminary injunction.

## IV. SECTION 53 APPLIES TO THE PROHIBITION OF ABORTION CLINICS

Defendants' alternate ground of unenforceability raises additional issues of first impression involving the Unruh Act and section 53. In the trial court, defendants asserted the restriction against operating an abortion clinic is discriminatory against women (i.e., is based on generalized traits of sex and medical condition) in violation of the Unruh Act. The lack of precedent on this type of claim was acknowledged by the trial court both during the hearing on the preliminary injunction and in its written ruling denying the request.

Our analysis of the relevant statutory text does not begin with the Unruh Act itself, but with section 53, a provision tied to the Unruh Act. Section 53 explicitly addresses the enforceability of discriminatory restrictions or prohibitions in written instruments relating to real property. Before we set forth section 53's text, we address how that statute affects the scope of the issues decided in this opinion. Section 53 was not relied upon by defendants in the trial court and the court's ruling did not refer to section 53. On appeal, defendants have argued that section 53 applies to the CC&Rs' abortion clinic prohibition and voids that prohibition. Defendants' argument expands the issues raised on appeal to include questions involving the interpretation and application of section 53 but also narrows the issues involving the Unruh Act. For example, because of section 53's scope, we do not reach whether defendants personally suffered an Unruh Act violation or whether they have representative standing under the Unruh Act.

The Association's reply brief did not mention section 53 and, thus, (1) did not directly address the statute's meaning or application to the facts of this case and (2) did not argue this court should not consider the issues raised by section 53 because those issues were not raised below. Nonetheless, the Association has indirectly addressed

25.

section 53's application by arguing the CC&Rs do not violate the Unruh Act because the CC&Rs do not discriminate against women, pregnant women, or women considering abortion. Restated in terms of section 53's text, the parties' have addressed whether a woman's decision to have an abortion should be treated as a "characteristic listed or defined in subdivision (b) or (e) of Section 51." (§ 53, subds. (a), (b).)

A.    Statutory Text

Section 53, subdivision (a) provides:

> "Every provision in a written instrument relating to real property that purports to forbid or restrict the conveyance, encumbrance, leasing, or mortgaging of that real property to any person because of any characteristic listed or defined in subdivision (b) or (e) of Section 51 is void, and *every restriction or prohibition as to the use* or occupation *of real property because of any characteristic listed or defined in subdivision (b) or (e) of Section 51 is void*." (Italics added.)

In addition, section 53, subdivision (b) states:

> "Every restriction or prohibition, whether by way of *covenant*, condition upon use or occupation, or upon transfer of title to real property, which restriction or *prohibition directly or indirectly limits* the acquisition, *use* or occupation of that *property because of any characteristic listed or defined in subdivision (b) or (e) of Section 51 is void*." (Italics added.)

A California real property treatise describes the impact of section 53 and parallel statutory provisions by stating: "By statute, restrictions that prevent the use of property on the basis of all classifications prohibited by the Unruh Act, and the Fair Employment and Housing Act, … are now completely unenforceable." (6 Miller & Starr, Cal. Real Estate, *supra*, § 16:35, p. 455 [defenses to enforcement—public policy or discrimination]; see Civ. Code, §§ 782 [discriminatory restrictions in deeds], 782.5 [discriminatory restrictions in title-related instruments], 4225, 6606.)

B.    Meaning and Application of Section 53

1.    *Prohibition as to Use*

The Association may have chosen not to address some aspects of the application of section 53's text to the facts of this case because that application to the provision addressing abortion clinics is straightforward.  First, the CC&Rs are clearly a "written instrument relating to real property" within the meaning of subdivision (a) of section 53. Because the CC&Rs were recorded, we do not decide whether this statutory provision applies to documents that are not recorded.

Second, the provision addressing abortion clinics is clearly a "prohibition" for purposes of section 53.  Section 7.01 ("Land Use") of the CC&Rs states that "nor shall any unit be used for the following types of practices: abortion clinic …."  The term "nor shall" is mandatory language that plainly states the specified practices are barred—that is, prohibited.

Third, the prohibition of abortion clinics in the CC&Rs qualifies as a prohibition "as to the use … of real property" within the meaning of subdivision (a) of section 53 and a prohibition "by way of covenant [or] condition upon use" of real property that "directly or indirectly limits the … use … of that property" within the meaning of subdivision (b) of section 53.  In particular, section 7.01 of the CC&Rs "directly" prohibits the Property from being used as an abortion clinic and, thus, "indirectly" limits individuals from obtaining abortion services at the Property.

We have set forth these seemingly obvious legal conclusions because the parties have not cited, and we have not located, a published appellate decision applying section 53's text to CC&Rs or other document containing a prohibition of abortion clinics.  In making these legal conclusions on issues not raised in the trial court, we have exercised our discretion to consider such issues because the relevant facts are undisputed and the

Association, despite having the opportunity, did not argue against considering section 53's application.

To summarize, based on the plain meaning of the statute and the undisputed contents of the CC&Rs, we conclude the land use prohibitions in section 7.01 of the CC&Rs are subject to section 53. As a result, the statute will render the prohibition of abortion clinics "void" if the prohibition is "because of any characteristic listed or defined" in the Unruh Act. (§ 53, subds. (a), (b).) Conversely, if the prohibition is not "because of any characteristic listed or defined" in the Unruh Act (§ 53, subds. (a), (b)), section 53 will not invalidate the prohibition.

We also conclude defendants have standing to raise section 53 as a ground rendering the prohibition of abortion clinics unenforceable. Defendants own or rent the Property, which is subject to a prohibition on its use, which gives them sufficient interest to assure the relevant facts and issues are adequately developed. (See *Schmier v. Supreme Court*, *supra*, 78 Cal.App.4th at p. 707 [interest required to have standing to sue].)

### 2. The List of Protected Characteristics

The list of characteristics expressly protected by the Unruh Act includes "sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, [and] immigration status." (§ 51, subd. (b).) The Unruh Act provides that "all persons" within California's jurisdiction, regardless of these characteristics, "are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." (§ 51, subd. (b).) The act of operating an abortion clinic and the decision to have an abortion are not expressly listed in subdivision (b) of section 51.

28.

Similarly, the Unruh Act's definitions do not address these decisions. " 'Sex' " is defined to include, "but *is not limited to*, pregnancy, childbirth, or medical conditions related to pregnancy or childbirth." (§ 51, subd. (e)(6), italics added.) The phrase "is not limited to" suggests sex is to be interpreted broadly. " 'Medical condition' has the same meaning as defined in subdivision (i) of Section 12926 of the Government Code." (§ 51, subd. (e)(3).) The California Fair Employment and Housing Act (FEHA; Gov. Code, § 12900 et seq.) states the term "medical condition" means either genetic characteristics or any cancer-related health impairment. (Gov. Code, § 12926, subd. (i).) Thus, having an abortion is not itself a "medical condition" as defined in the FEHA and the Unruh Act.

The Unruh Act's list of characteristics and the definitions of those characteristics does not explicitly *include* or *exclude* the act of operating an abortion clinic and the decision to have an abortion. Consequently, we next consider how to interpret the phrase "any characteristic listed or defined in subdivision (b) or (e) of Section 51." (§ 53, subds. (a), (b).) It could be interpreted narrowly to mean characteristics *expressly* listed or defined in the Unruh Act. Alternatively, it could be interpreted liberally to include both expressly listed characteristics and those added by judicial construction.

### 3. Recognizing Unlisted Characteristics

When discussing the Unruh Act, the California Supreme Court has stated the kinds of discrimination its specifies are "illustrative, rather than restrictive, indicia of the type of conduct condemned." (*In re Cox* (1970) 3 Cal.3d 205, 212 (*Cox*); *Marina Point, Ltd. v. Wolfson* (1982) 30 Cal.3d 721, 725 [same]; *Civil Rights Dept. v. Cathy's Creations, Inc.* (2025) 109 Cal.App.5th 204, 226 [Unruh Act's "protection against discrimination is not confined to the expressly articulated classes"].) This statutory construction was approved by the Legislature when it adopted the Civil Rights Act of 2005 and declared:

> "In keeping with that history and the legislative history of the Unruh
> Civil Rights Act, California courts have interpreted the categories
> enumerated in the act to be illustrative rather than restrictive. It is

29.

the intent of the Legislature that these enumerated bases shall continue to be construed as illustrative rather than restrictive." (Stats. 2005, ch. 420, § 2, subd. (b); see § 51.7, subd. (b)(1) [list of characteristics "is illustrative rather than restrictive"].)

Given the Legislature's explicit guidance and the general principle that the "Unruh Act is to be liberally construed with a view to effectuating the purposes for which it was enacted and to promote justice" (*Koire v. Metro Car Wash* (1985) 40 Cal.3d 24, 28), we conclude the phrases "any characteristic listed or defined in subdivision (b) or (e) of Section 51" in section 53 also should be interpreted to include characteristics added to the Unruh Act's protection by judicial construction. Accordingly, we consider the principles used by courts when determining whether to include a particular characteristic with those listed in the Unruh Act and those already added by judicial construction.

### 4. *Identifying Unlisted Yet Protected Characteristics*

In *Cox*, the court determined the history and language of the Unruh Act "disclose a clear and large design to interdict all arbitrary discrimination by a business enterprise" but explained "that this broad interdiction of the [Unruh A]ct is not absolute." (*Cox*, *supra*, 3 Cal.3d at p. 212.) For instance, the act did not prohibit a business from asking a customer to leave its premises if the customer damaged property, injured others, or otherwise disrupted the business. (*Id*. at p. 217.) In contrast, the court illustrated what it meant by "arbitrary" discrimination by stating a business could not "exclude individuals who wear long hair or unconventional dress, who are black, who are members of the John Birch Society, or who belong to the American Civil Liberties Union, merely because of these characteristics or associations." (*Id*. at p. 217–218.)

In the 1980's, the Supreme Court recognized the Unruh Act protected additional unlisted characteristics from discrimination by business establishments. The owner of an apartment is prohibited from refusing to rent an apartment to a family with a minor child. (*Marina Point, Ltd. v. Wolfson*, *supra*, 30 Cal.3d at p. 735.) Also, a restriction in the CC&Rs of a condominium development limiting residency to persons over the age of 18

30.

violated the Unruh Act. (*O'Connor v. Village Green Owners Assn.* (1983) 33 Cal.3d 790, 792.)

In 1991, the Supreme Court "created a three-part analytic framework for determining whether a future claim of discrimination, involving a category not enumerated in the statute or added by prior judicial construction, should be cognizable under the [Unruh] Act." (*Koebke v. Bernardo Heights Country Club* (2005) 36 Cal.4th 824, 840 (*Koebke*), citing *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142 (*Harris*), superseded by statute on another ground as noted in *Munson v. Del Taco, Inc.* (2009) 46 Cal.4th 661, 664.) The three inquiries are (1) whether the claim is based on a personal characteristic similar to those listed in the statute; (2) whether the alleged discrimination is justified by a legitimate business interest; and (3) what the potential consequences of recognizing the new claim will be. (*Koebke*, *supra*, at p. 841, citing *Harris*, *supra*, at p. 1154; see *Semler v. General Electric Capital Corp.* (2011) 196 Cal.App.4th 1380, 1392–1393.)

In *Harris*, two women filed a representative action against the owner and the managers of two apartment buildings, alleging their requirement that prospective tenants have a gross monthly income of at least three times the rent charged constituted arbitrary economic discrimination and sex discrimination due to its adverse impact on women. (*Harris*, *supra*, 52 Cal.3d at p. 1148–1149.) The trial court sustained the defendants' demurrers without leave to amend and the Court of Appeal reversed as to the economic discrimination claim. (*Id*. at p. 1149.) The Supreme Court reversed the appellate court and directed both claims be dismissed. (*Id*. at p. 1175.) The Supreme Court concluded a sex discrimination claim under the Unruh Act required intentional discrimination and, thus, could not be established using a disparate impact analysis. (*Harris*, *supra*, at p. 1175.) The court also rejected the claim of arbitrary economic discrimination, concluding the minimum income requirement did not distinguish among persons based

on the classifications listed in the Unruh Act or similar personal traits and the distinctions made were based on the landlord's legitimate business interest in assessing prospective tenant's ability to pay rent on a continuing basis. (*Harris*, *supra*, at p. 1169.) The court noted that economic distinctions furthering legitimate business interests are fundamentally different from the categories specified in the Unruh Act or added by judicial construction. The court stated the unspecified categories added by judicial construction—physical appearance and family status—"were based on *personal characteristics* of individuals that bore little or no relationship to their abilities to be responsible consumers of public accommodations." (*Harris*, *supra*, at p. 1148, italics added.)

In 2005, 14 years after *Harris*, the Supreme Court acknowledged it had not defined the term "personal characteristic" used in the first prong of the three-part *Harris* analysis. (*Koebke*, *supra*, 36 Cal.4th at p. 842.) The court explained the term by stating the categories enumerated in the Unruh Act or added by judicial construction "represent traits, conditions, decisions, or choices fundamental to a person's identity, beliefs and self-definition." (*Koebke*, at pp. 842–843.) For purposes of applying the first prong of the *Harris* framework to this case, we refer to this standard as the *Koebke* test.

In *Koebke*, the plaintiffs were registered domestic partners who sued a country club for refusing to extend them certain benefits extended to married couples. (*Koebke*, *supra*, 36 Cal.4th at p. 831.) The court stated, "the decision whether to enter into a domestic partnership is motivated by personal values and beliefs," a fact confirmed by the California Domestic Partner Rights and Responsibilities Act of 2003. (*Koebke*, at p. 843.) Thus, the court concluded the *Koebke* test was satisfied and concluded "discrimination against registered domestic partners in favor of married couples is a type of discrimination that falls within the ambit of the [Unruh] Act." (*Koebke*, at p. 846.)

32.

We conclude the principles contained in *Harris* and *Koebke* control whether an individual's decision to have an abortion should be treated as a "characteristic listed or defined" in the Unruh Act for purposes of subdivision (a) and (b) of section 53. Those principles include the three-part analysis adopted in *Harris* and the *Koebke* test used to complete the first prong of that analysis. Accordingly, we next consider the application of those principles to the record before us. Unlike the application of section 53, that particular analysis does not involve issues that were not raised and considered in the trial court because the trial court discussed the three-part analysis, including the *Koebke* test.

        5.      *The Decision to Have an Abortion is a Protected Characteristic*

The Association contends the *Koebke* test is not satisfied because "simply making a choice to undertake (or undergo) an action does not of itself create a protected class of choice-makers, even if the choice involves a constitutional right." The Association argues the requisite choice "is not a one-time action, but a choice that moves the individual into or out of, or identifies one with, a category of individuals." The Association's examples of decisions that put an individual into a protected category are (1) the decision to get married, which places the individual in the class of married persons protected from discrimination, and (2) the decision to join a particular religion, which makes the person a member and protected from discrimination against that religion.

The Association cites *Gayer v. Polk Gulch, Inc.* (1991) 231 Cal.App.3d 515 (*Gayer*), a case in which the plaintiff sued the owner of a bar for permanently excluding him from entering the premises. (*Id*. at p. 517.) A doorman had told the plaintiff he would not be served because he had filed a lawsuit against the bar in small claims court. In the prior small claims action, plaintiff alleged the defendant, a gay bar, had discriminated against him in violation of the Unruh Act because he was gay. (*Gayer, supra,* at p. 518, fn. 2.) The First District (1) concluded that membership in a protected class is a requirement for protection under the Unruh Act and (2) rejected plaintiff's

argument that he was a member of a class of civil rights litigants. (*Gayer*, *supra*, at pp. 522, 525.) The court addressed the first prong of the *Harris* framework by stating the bar's discrimination against the plaintiff "is neither based on status as a member of a class nor on personal characteristics but is, instead, based on the conduct of an individual" and cited a case stating the Unruh Act " 'does [not] seek to remedy discrimination based on purely personal grounds.' " (*Gayer*, *supra*, at p. 525.) In other words, the plaintiff was treated differently because he had sued the bar, not because he was a member of a class of civil rights litigants.[6]

Gayer was filed before the Supreme Court decided *Koebke* and stated the common element among the categories protected by the Unruh Act was "that they represent traits, conditions, *decisions*, or *choices* fundamental to a person's identity, beliefs and self-definition." (*Koebke*, *supra*, 36 Cal.4th at pp. 842–843, italics added.) The distinction drawn in *Gayer* between personal *characteristics* and *conduct* does not fit perfectly with the Supreme Court's inclusion of characteristics that represent *decisions* or *choices* fundamental to a person's identity, beliefs and self-definition. (See *Koebke*, *supra*, at pp. 842–843.) Therefore, to the extent that *Gayer*'s discussion of conduct conflicts with the *Koebke* test's analysis of decisions and choices, we must follow the Supreme Court's *Koebke* decision. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) As a result, labeling the decision to have an abortion as conduct does not resolve how the *Koebke* test should be applied to that decision.

---

**6**     The court in *Gayer* addressed the third prong of the *Harris* framework by stating: "Were we to hold that the conduct involved here gave rise to a protected class under the [Unruh] Act, we would open the door for a seemingly endless stream of new cases never contemplated by the Legislature. Given such lack of legislative direction, this court is reluctant to add a new class of 'civil rights litigants' within the protection of the [Unruh] Act." (*Gayer*, *supra*, 231 Cal.App.3d at p. 525.)

Furthermore, the ban of the plaintiff from the business in *Gayer* is factually distinguishable from the prohibition of abortions in this case because the ban affected only a single individual and was not shown to have affected other members of the class that the plaintiff argued were being discriminated against—namely, civil rights litigants. Here, the prohibition of abortion clinics, if enforced, would affect every individual who would have sought abortion services from FPA at the Property. Thus, the prohibition is not " 'purely personal' " in the sense it affects only a single individual but applies to everyone in the class. (*Gayer*, *supra*, 231 Cal.App.3d at p. 525; see *Scripps Clinic v. Superior Court* (2003) 108 Cal.App.4th 917, 934 [no Unruh Act violation for medical group to deny care for any patient who previously sued the group for medical malpractice].) As a result, the reasoning in *Gayer* does not persuade us to abandon or limit the *Koebke* test. Accordingly, we next consider whether an individual's decision to have an abortion is a "decision[] or choice[] fundamental to a person's identity, beliefs and self-definition." (*Koebke*, *supra*, 36 Cal.4th at pp. 842–843.)

The California Supreme Court's statements about the decision to have an abortion (see pt. II.B.2., *ante*) guide our application of the *Koebke* test. In *Lungren*, the court stated its earlier decisions had explained:

> "[T]he right to choose whether to continue or to terminate a pregnancy implicates a woman's fundamental interest in the preservation of her personal health (and in some instances the preservation of her life), her interest in retaining personal control over the integrity of her own body, and her interest in deciding for herself whether to parent a child. And our court also has made clear the profound importance of this constitutional right: 'This right of personal choice is central to a woman's control not only of her own body, but also to the control of her social role and personal destiny.... *"The implications of an unwanted child for a woman's education, employment opportunities and associational opportunities (often including marriage opportunities) are of enormous proportion."* [Citation.]' (*Myers, supra,* 29 Cal.3d at p. 275, italics added.) The right of choice also may implicate a woman's deepest philosophical, moral, and religious concerns, including her personal beliefs regarding the meaning of human existence and the beginning of

35.

human life. (Accord, [*Planned Parenthood of Southeastern Pa. v.*] *Casey* [(1992)] 505 U.S. 833, 851 [112 S.Ct. 2791, 2806–2807] (lead opn.) ['[P]ersonal decisions relating to ... procreation ... involv[e] the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy ... [and] to the liberty protected by the Fourteenth Amendment. At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life.'].) In *Myers*, *supra*, 29 Cal.3d 252, 275, we declared that a pregnant woman's constitutional right of choice is "clearly among the most intimate and fundamental of all constitutional rights." (*Lungren*, *supra*, 16 Cal.4th at pp. 332–333; see *Lewis v. Superior Court*, *supra*, 3 Cal.5th at p. 573.)

This discussion leaves little doubt that the decision to have an abortion is a personal "choice[] fundamental to a person's identity, beliefs and self-definition." (*Koebke*, *supra,* 36 Cal.4th at pp. 842–843.) The fact the discussion cites *Casey*, a decision overruled by *Dobbs*, *supra*, 597 U.S. at page 231, does not undermine the court's description of how the choice to continue or terminate a pregnancy is viewed under California law. Furthermore, the discussion in *Lungren* is not out of date because the fundamental nature of an individual's right to choose was confirmed after *Lungren* and *Dobbs* when voters passed Proposition 1 in November 2022. (See Cal. Const., art. I, § 1.1.) Therefore, we resolve an issue of first impression by concluding the decision or choice to have an abortion satisfies the *Koebke* test, which is the first prong of the *Harris* analysis.

The second prong of the three-part analytic framework adopted in *Harris* asks "whether a legitimate business interest justified" the alleged discrimination. (*Koebke*, *supra*, 36 Cal.4th at p. 841.) The trial court addressed this prong by stating "the Association does not expressly articulate any legitimate business interest justified by the CC&Rs prohibition against abortion clinics." The court also stated, "the Association does not submit any argument, or evidence, to the effect that a legitimate business interest underlies the CC&Rs prohibition of abortion clinics." As a result, the court determined

36.

the Association had not carried its burden of establishing a likelihood of prevailing on the merits.

We conclude the Association had the burden of proving a legitimate business interest justified the prohibition and the standard of review applied to the trial court's determination that the Association failed to carry the burden is whether the evidence compels a finding in the Association's favor as a matter of law. (*Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838; *Valero v. Board of Retirement of Tulare County Employees' Assn.* (2012) 205 Cal.App.4th 960, 966.) On appeal, the Association has not acknowledged this standard of review, which is difficult to meet, and has not cited evidence in the record compelling a finding in its favor. As a result, the Association has not carried its burden, as the appellant, of affirmatively demonstrating trial court error. (*Denham v. Superior Court, supra,* 2 Cal.3d at p. 564 [an order challenged on appeal is presumed correct and it is the appellant's burden to affirmatively show the trial court erred].)

The third prong of the *Harris* analysis examines "the consequences that will flow from a particular interpretation"—that is, from adding a characteristic to the types of discrimination prohibited by the Unruh Act. (*Harris*, *supra*, 52 Cal.3d at p. 1165.) This prong is derived from the principle of statutory construction that courts addressing the meaning of an ambiguous statute should consider the consequences of the competing interpretations. (See *Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [where uncertainty exists consideration should be given to the consequences that will flow from a particular statutory interpretation]; *Zieve, Brodnax & Steele, LLP v. Dhindsa* (2020) 49 Cal.App.5th 27, 35 [same].) Therefore, we conclude the third prong of the *Harris* analysis applies generally and is not limited to characteristics that are economic or financial.

One consequence of including the decision to have an abortion with the characteristics listed in subdivision (b) of section 51 is that business establishments could not refuse accommodations or services to individuals who were considering having an abortion or who had had an abortion. The parties' briefing does not discuss the existence or prevalence of this particular type of discrimination in California or elsewhere. An example is a taxi or ride-share driver who refuses to transport a woman from a nonprofit hospital that does not perform abortions to a hospital that performs such procedures. A second example is the owner of a restaurant who refuses to serve a person seen leaving a family planning clinic because the owner perceives that person to be someone who has had or is considering an abortion. There is nothing in the record suggesting that treating women who consider or decide to have an abortion as "a protected class under the [Unruh] Act … would open the door for a seemingly endless stream of new cases." (*Gayer*, *supra*, 231 Cal.App.3d at p. 525.) Given the many statutes that address abortion and the private nature of the right to choose an abortion, it is unlikely the Legislature would condone discrimination against this class of women.

The Association has argued that a consequence of interpreting the statute broadly is that private landowners will be required to make their property available for the provision of abortion services, which would interfere with the right of landowners to choose to oppose abortion. This argument does not accurately reflect the scope of the statutory interpretations adopted in this opinion and, as a result, overstates the consequences.

Our conclusion that the decision to have an abortion is included with the characteristics listed in subdivision (b) of section 51 and is limited by the further conclusion that a land use prohibition of abortion clinics "*indirectly* limits the … use … of [real] property" "because of" that decision for purposes of subdivision (b) of section 53. This interpretation and application of section 53 to void a recorded instrument's

prohibition or restriction on the use of real property is readily distinguished from affirmatively requiring a landowner to rent his or her property to an abortion clinic. Individual choice on the subject of abortion is the thread that runs through this opinion, and nothing should be interpreted as compelling a landowner's choice, one way or the other. The prohibition in the CC&Rs is not an individual choice. Rather, the CC&Rs were the hospital district's attempt to take the choice away from the individual who own or rent units within the medical center. A statutory interpretation that voids the land use prohibition of abortion clinics means that the creator of CC&Rs, equitable servitudes, or restrictive covenants cannot impose that prohibition on subsequent owners and thereby deprive them of the choice. In other words, voiding the restriction would not compel any owner to rent to an abortion clinic or to offer abortion services on their property. As a result, that type of compulsion is not a consequence of the statutory interpretation adopted in this opinion.

A consequence that does *not* flow from our interpretation of section 53 is a broadening of the standing requirements applied to a cause of action seeking relief under the Unruh Act. Section 53 voids a prohibition that is "because of" a characteristic protected by the Unruh Act without an inquiry into whether the plaintiff has personally suffered discrimination prohibited by the Unruh Act or has standing to assert a violation suffered by a third party, which is sometimes referred to a *jus tertii* standing. (See *Glassdoor, Inc. v. Superior Court* (2017) 9 Cal.App.5th 623, 629.)

Other consequences raised by the Association are tied to the rationale for presuming land use restrictions in CC&Rs are reasonable. (See pt. II.C., *ante.*) The Association contends the failure to enforce the prohibition would (1) undermine the expectations of the owners of other units within the medical center and (2) force those owners in the medical center to endure the negative impacts that picketers and protestors,

even when lawful and unobstructive, have on their businesses, their employees, and their patients.

The argument that a land use restriction prohibiting an activity involving the exercise of an individual's fundamental constitutional right should be upheld because of protestors is unconvincing because it would, in practical effect, empower protestors to override the personal choices of patients, healthcare providers, and landlords. The balance struck by the California Constitution and by legislation addressing abortion is that the decision to have an abortion or participate in an abortion procedure is personal. Finally, to the extent that other owners expect the prohibition to be enforced, that general expectation must give way to California's public policy on abortion and the requirements of section 53, which are more specific than section 5975 or section 6856. Stated another way, it is not reasonable to expect that a prohibition contrary to California's public policy will be enforced.

Consequently, we conclude that applying the three-part *Harris* analysis and our interpretation of section 53 to the record before us leads to the conclusion that the Association did not establish a likelihood of success on the merits. As a result, section 53 provides an alternate ground for affirming the trial court's denial of the preliminary injunction request.

V.    OTHER ISSUES*

First, during oral argument, counsel for the Association expressed the concern that statements in this opinion might amount to advisory opinions on matters that have not been fully developed at this stage of the proceedings. This concern is addressed by the principle that the affirmance of an order granting or denying a "preliminary injunction is not a decision on the merits." (*IT Corp. v. County of Imperial* (1983) 35 Cal.3d 63, 75.)

---

\*      See footnote, *ante*, page 1.

The concern is also addressed by the doctrine of " 'law of the case' " (*Crespin v. Coye* (1994) 27 Cal.App.4th 700, 708), which will be applied by the trial court, aided by counsel's arguments, to determine the binding nature of this opinion's legal conclusions in the proceedings that follow.

Second, the Association's argument about a lack of animus towards women was not addressed in our application of the three-part *Harris* analysis because animus (i.e., a discriminatory motive) is not required when a prohibition is discriminatory on its face. Similarly, animus is not relevant to our determination that, for purposes of subdivision (b) of section 53, the prohibition of abortion clinics "indirectly" limits the use of the Property "because of" a characteristic protected by the Unruh Act Property.

Third, this opinion does not address whether there was a reasonable threat the prohibition of surgi-centers (which appears to be facially neutral) would be violated by the performance of surgical abortions by FPA on the Property or other issues relating to the surgi-center prohibition in section 7.01 of the CC&Rs.

Fourth, the parties have not raised, and this opinion does not consider, the impact, if any, on our analysis of the Unruh Act and section 53 of the FEHA's inclusion of "reproductive health decisionmaking" among the characteristics it protects from discrimination. The term was added by the Contraceptive Equity Act of 2022 (see Stats. 2022, ch. 630, §§ 3–5) and is defined as follows:

> " 'Reproductive health decisionmaking' includes, but is not limited to, a decision to use or access a particular drug, device, product, or medical service for reproductive health. This subdivision and other provisions in this part relating to 'reproductive health decisionmaking' shall not be construed to mean that subdivision (r) of this section and other provisions in this part related to 'sex' do not include reproductive health decisionmaking." (Gov. Code, § 12926, subd. (y).)

Fifth, this opinion does not address whether section 1.1 of article I of the California Constitution applies only to action by "[t]he state" or, more broadly, reaches

action by the state and by private parties. We note the provision should be read as a whole and it includes a sentence stating: "Nothing herein narrows or limits the right to privacy or equal protection." (Cal. Const., art. I, § 1.1.) We also note the parties have not asked this court to consider Proposition 1's voter information guide or other extrinsic materials, which might address whether the fundamental right to choose, like the right of privacy, is protected from private interference. (See *San Francisco Taxpayers Assn. v. Board of Supervisors* (1992) 2 Cal.4th 571, 579 [court considered materials in the ballot pamphlet, including Legislative Analyst's views].)

Sixth, this opinion (like our request for supplemental briefing) does not address a second type of constitutional violation—namely, whether the prohibition of abortion clinics *discriminates* against the exercise of a fundamental right and, if enforced, would deny "equal protection of the laws." (Cal. Const., art. I, § 7, subd. (a); see *Myers*, *supra*, 29 Cal.3d at pp. 276–277, fn. 22.)

Lastly, this opinion does not address whether FPA's decision to operate an abortion clinic on the Property is a personal characteristic of FPA protected by the Unruh Act. (See § 51.5, subd. (b) [a corporation is a person protected from discrimination].) Defendant's cross-complaint alleged that the enforcement of the prohibition of abortion clinics would result in FPA being "denied the right to provide important and accessible women's health care" at the Property. Read broadly, this allegation could be interpreted as asserting that FPA and health care personnel have a right to provide abortion services and exercising that right is a characteristic protected by the Unruh Act. We identify the question of whether FPA's providing abortion services is a personal characteristic protected by the Unruh Act and do not resolve it because the parties did not develop arguments and authorities in the proceedings below or on appeal, and the denial of the preliminary injunction is affirmed on other statutory grounds. Thus, if defendants pursue the theory in subsequent proceedings, this opinion should not be construed as (1) limiting

42.

the parties' ability to develop arguments, cite authority, and present the evidence they deem relevant or (2) impliedly deciding how the issue should be resolved.

## DISPOSITION

The order denying the Association's application for a preliminary injunction is affirmed. Defendants, as the prevailing party before this court, shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)

FRANSON, J.

**WE CONCUR:**

HILL, P. J.

HARRELL, J.

43.